United States Court of Appeals,

Eleventh Circuit.

Nos. 95-4844, 95-5586.

Robert A. BECK, II, Plaintiff-Appellant,

v.

Ronald M. PRUPIS, Leonard Bellezza, Ernest J. Sabato, William Paulus, Jr., Harry Olstein, Frederick C. Mezey, Byron L. Sparber, Joseph S. Littenberg, Defendants-Appellees.

Robert A. BECK, II, Plaintiff-Appellee,

v.

Ronald M. PRUPIS, Leonard Bellezza, Ernest J. Sabato, William Paulus, Jr., Harry Olstein, Frederick C. Mezey, Byron L. Sparber, Joseph S. Littenberg, Defendants-Appellants.

Dec. 15, 1998.

Appeals from the United States District Court for the Southern District of Florida. (No. 91-8121-CIV-NCR), Norman C. roettger, Judge.

Before TJOFLAT and BARKETT, Circuit Judges, and GODBOLD, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

This case hinges on the following question: Must a plaintiff bringing a civil RICO conspiracy claim prove that the overt act (in furtherance of the conspiracy) by which he was injured was an "act of racketeering"? We answer this question in the affirmative, and therefore affirm the district court's grant of summary judgment.

I.

This case arises out of the relationship between Robert A. Beck, II, the plaintiff, and members of the board of directors of the Southeastern Insurance Group (SIG).[1] SIG was a holding

---

[1]Beck's claims were originally brought as cross-claims while he was a defendant in a shareholder derivative suit against SIG and its directors in the United States District Court for

company founded in 1983. It owned three subsidiaries, all of which were in the business of writing surety bonds for construction contractors. The defendants in this case were all directors of SIG at one time.

In 1987, some of the directors of SIG (including the defendants) began engaging in improper activity. For instance, they set up an entity called Construction Performance Corporation (CPC), which extracted substantial "fees" from otherwise non-creditworthy contractors in order to qualify them for SIG surety bonds, in violation of insurance regulations. The directors reneged on promises to indemnify certain contractors, and diverted corporate funds to their personal use. Finally, these directors knowingly classified certain SIG liabilities as assets on SIG's financial statements, causing the statements drastically to overestimate the corporation's value. These false financial statements were then given to regulators, shareholders, and creditors.

This misconduct eventually led to a lawsuit by the Florida Department of Insurance and a shareholders' derivative suit against SIG's officers and directors. In January 1990, as a result of the illegal activities of certain SIG directors and the consequent lawsuits, SIG filed for bankruptcy in the Southern District of Florida.

Meanwhile, in August 1983, SIG had hired Beck to serve as president and as a member of the board of directors.[2] His employment contract, as revised in 1986, did not expire until 1991. The

---

the District of New Jersey. While that suit was pending, SIG filed for bankruptcy and the bankruptcy trustee retained plaintiffs' counsel (in the derivative suit) to represent the estate of SIG as a co-plaintiff in the derivative suit. Beck's cross-claims were subsequently severed and transferred to the Southern District of Florida, from which this appeal comes. For ease of discussion, we treat the cross-claims as an original lawsuit, and refer to the parties as plaintiff and defendants.

[2]Beck was also CEO of SIG for a portion of his presidency.

2

contract specified the grounds on which Beck's employment could justifiably be terminated,[3] and stated that termination for any other reason would result in SIG being required to repurchase Beck's substantial stock holdings in the company. The repurchase price would be the fair market value of the stock as determined by an investment bank.

For most of his tenure, Beck was unaware of the illegal activities of the other SIG officers and directors. When he became aware of this misconduct in early 1988, he attempted to correct them internally and informed insurance regulators about improprieties in SIG's financial statements. The other directors, afraid that Beck might expose their misdeeds, arranged for a consulting firm to write a report criticizing Beck's performance, thus providing the directors an excuse to terminate Beck's employment without having to repurchase Beck's stock. In May 1988, Beck was fired.

While president, Beck made a number of unwise (in retrospect) personal financial decisions in relation to SIG. He purchased, as part of a 1986 private placement, a $150,000 debenture and $75,000 worth of stock, and (together with other directors), in December 1987, personally guaranteed a $7.5 million bank loan to SIG. When SIG filed for bankruptcy, Beck's SIG investments became practically worthless, and he became potentially liable for the bank loan.[4]

Beck claims that SIG's other directors fraudulently induced him to make these financial decisions.[5] Specifically, Beck claims that the defendants' failure to tell him about his impending

---

[3]One such ground was "[Beck's] inability or substantial failure to perform [his] material duties."

[4]Beck never actually had to pay any of the guaranteed amount, but is suing for the attorney's fees he incurred in the subsequent lawsuit brought by the bank.

[5]All of the other SIG directors were originally named as defendants in Beck's cross-claim. Some of these directors have since been dismissed from the case pursuant to settlement agreements.

3

termination[6] or about the illegal activities at SIG induced him to purchased the debenture and the stock. For these same reasons, along with the defendants' issuance of erroneous financial statements, Beck claims that he was fraudulently induced to guarantee the bank loan and to retain his stock longer than he would have otherwise.

Beck claims that these inducements, as well as the creation of fictitious reasons for his firing, constitute mail fraud, *see* 18 U.S.C. § 1341 (1994), and wire fraud, *see* 18 U.S.C. § 1343 (1994), on the part of the defendants. Furthermore, Beck claims that the combination of these offenses constitutes a "pattern of racketeering activity"[7] under the federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968 (1994), and that the defendants' participation in that pattern of racketeering activity injured him, giving him a private right of action based on RICO's substantive provisions. *See* 18 U.S.C. §§ 1962(c), 1964(c) (1994).[8] Beck also alleges that

---

[6]Beck alleges that the SIG directors had been planning to terminate his employment as president and director as early as 1987 (even before he discovered their wrongdoing), but concealed these plans from him. In addition, Beck was removed from his position as CEO in 1986; Beck alleges that SIG's directors had been planning to remove him much earlier but waited until after he had invested in SIG's private placement.

[7]Section 1961(1) of RICO defines the activities that constitute "racketeering activity"; these include mail and wire fraud. Section 1961(5) defines a "pattern of racketeering activity" as at least two acts of racketeering activity within ten years of one another.

[8]Section 1964(c) of RICO creates a private right of action for anyone injured "by reason of" a violation of section 1962(a)-(d). Section 1962 consists of three substantive provisions, 18 U.S.C. § 1962(a)-(c), and one conspiracy provision, 18 U.S.C. § 1962(d). The three substantive provisions are structured as follows: Section 1962(a) prohibits the investment of proceeds derived from a pattern of racketeering activity in any enterprise involving interstate commerce. Section 1962(b) prohibits acquisition through a pattern of racketeering activity of any interest in an enterprise involving interstate commerce. Section 1962(c) prohibits participation in the conduct of an enterprise involving interstate commerce through a pattern of racketeering activity. Although Beck's cross-claim alleges violations of all three substantive provisions, he has not presented evidence to demonstrate that the defendants invested proceeds from the relevant racketeering activities in an enterprise involving interstate commerce, or that the defendants' racketeering activity led to acquisition of an interest in an enterprise involving interstate

4

the defendants conspired to commit racketeering acts against third parties (through the phony financial statements, extortion of illegal fees, etc.);  according to Beck, because his refusal to participate in and partial disclosure of that conspiracy resulted in his termination, he was injured "by reason of" the conspiracy and therefore has a claim under RICO's conspiracy provision, 18 U.S.C. § 1962(d).

Beck sued the defendants for these alleged RICO violations, as well as numerous alleged violations of state law.  The defendants moved for summary judgment and for sanctions pursuant to 28 U.S.C. § 1927 and Rule 11 of the Federal Rules of Civil Procedure.  The district court granted the motion for summary judgment on Beck's RICO claims, and then declined to exercise supplemental jurisdiction over Beck's state law claims.  The court denied the motion for sanctions. Beck appeals the summary judgment ruling, and the defendants appeal the denial of sanctions.

II.

Most of Beck's RICO claims allege substantive violations premised on 18 U.S.C. § 1962(c). We find these claims to be without merit, for the reasons discussed below.

A.

To prove any RICO violation, a plaintiff must prove the existence of a "pattern of racketeering activity."  18 U.S.C. § 1962.  A variety of acts can constitute "racketeering activity," *see* 18 U.S.C. § 1961(1);  the acts alleged in this case are mail and wire fraud, the substantive

commerce.  Beck therefore has no claim under section 1962(a) and (b).  Beck has, however, presented evidence for a claim under section 1962(c);  the alleged "enterprise" is SIG. We therefore treat all of his substantive claims as 1962(c) claims.

5

elements of which are identical.[9] *See Pelletier v. Zweifel,* 921 F.2d 1465, 1498 (11th Cir.1991). Both offenses consist of intentional participation in a scheme to defraud another of money or property. *See id.* A "scheme to defraud" involves the making of misrepresentations intended and reasonably calculated to deceive persons of ordinary prudence and comprehension. *See id.* at 1498-99. This means, *inter alia,* that the plaintiff must prove that a reasonable person would have relied on the misrepresentations. *See United States v. Brown,* 79 F.3d 1550, 1557 (11th Cir.1996).

In addition to proving racketeering activity, a civil RICO plaintiff must show that the racketeering activity caused him to suffer an injury. *See* 18 U.S.C. § 1964(c). This is true even when a criminal conviction for the underlying racketeering activity would not require a showing of actual injury, as is the case with mail and wire fraud. *See Pelletier,* 921 F.2d at 1499. Furthermore, the racketeering activity must be more than simply the "but for" cause of the injury; it must also be the proximate cause. *See Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 1317-18, 117 L.Ed.2d 532 (1992). "[A] factor is a proximate cause if it is a substantial factor in the sequence of responsible causation." *Cox v. Administrator United States Steel & Carnegie,* 17 F.3d 1386, 1399 (11th Cir.1994) (internal quotation omitted).

Because this case comes to us on a granted motion for summary judgment, we have viewed all evidence in favor of the non-moving party (i.e., Beck). *See Rayle Tech, Inc. v. DEKALB Swine Breeders, Inc.,* 133 F.3d 1405, 1409 (11th Cir.1998). Summary judgment is to be granted when the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is appropriate

---

[9]The only difference between the two offenses is their jurisdictional basis—mail fraud requires proof of the use of the mails, while wire fraud requires proof of the use of the wires.

where the moving party shows an absence of evidence to support an essential element of the nonmoving party's case. *See Weiss v. School Bd. of Hillsborough County,* 141 F.3d 990, 994 (11th Cir.1998). For each alleged RICO violation in this case, Beck has failed to produce evidence to support at least one of the essential elements of a RICO claim based on mail and wire fraud. For this reason, we affirm the district court's grant of summary judgment.[10]

B.

Beck claims that he was fraudulently induced to make certain unwise financial decisions in three ways: (1) the defendants' failure to tell him about his impending termination, (2) the defendants' failure to inform him of their illegal activities, and (3) the defendants' creation of false financial statements. Although two of these inducements are omissions rather than direct misrepresentations, material omissions can be the basis for a claim of fraud if they are intended to create a fraudulent representation. *See United States v. O'Malley,* 707 F.2d 1240, 1247 (11th Cir.1983).

---

[10]The district court held that Beck's injuries are based on his status as a creditor and stockholder, and that his injuries are therefore too indirect to give him standing under RICO. The district court is correct that a creditor or stockholder lacks standing when his claim is based solely on acts of racketeering that target the corporation. *See Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.,* 140 F.3d 898, 906 (11th Cir.1998); *Warner v. Alexander Grant & Co.,* 828 F.2d 1528, 1530 (11th Cir.1987). A plaintiff's status as a creditor or stockholder, however, does not preclude standing for RICO violations if the plaintiff has alleged an injury proximately caused by the defendants' acts of racketeering that target the plaintiff. *See id.* at 1530-31. In this case, Beck has properly set forth claims of injury proximately caused by racketeering activity that targeted him. We therefore hold that he has standing under RICO. However, after numerous pleadings, depositions, and affidavits, Beck has not brought forward evidence that would create a genuine issue of material fact on certain key elements of his claims. Thus, we affirm the decision of the district court, but on different grounds. *See Turner v. American Fed. of Teachers Local 1565,* 138 F.3d 878, 880 n. 1 (11th Cir.1998) ("We must affirm the judgment of the district court if the result is correct even if the district court relied upon a wrong ground or gave a wrong reason.").

7

The defendants' failure to tell Beck of his impending termination cannot serve as the basis for a claim of fraud, because a reasonable person making financial decisions would not have relied on such an omission. Beck's employment contract makes no guarantee of employment throughout the term of the contract. On the contrary, the contract has an explicit termination provision that prescribes, in substantial detail, what is to happen if SIG terminates Beck's employment for any reason. Thus, the employment contract itself explicitly contemplates the possibility of termination (both "for cause" and "without cause"), and Beck therefore could not have reasonably relied on continuing employment.[11] Furthermore, Beck has presented no evidence that the defendants refrained from telling him of his impending termination in an attempt to induce him to make financial commitments to SIG. He therefore has not proven the essential element of intent.

The defendants' failure to tell Beck about their illegal activities also cannot serve as the basis for a claim of fraud, because, here again, Beck has presented no evidence of the defendants' fraudulent intent to induce Beck to make these investment decisions. The usual reason why people do not disclose that they are engaging in illegal activity is that they do not want to get caught, not because they want to induce others to invest. Beck has produced no evidence suggesting that, in this case, the omission was intended to induce Beck to make financial commitments to the company. Also, Beck has presented no evidence that this omission proximately caused his losses. He has repeatedly stated that had he known about the illegal activities, he would not have made the same financial decisions. As noted above, however, this type of "but for" causation is insufficient to

---

[11]Beck also claims that the private placement memorandum issued in conjunction with the stock/debenture offering in which he invested contained an affirmative misrepresentation that he would continue as president and CEO of SIG. This alleged "misrepresentation," however, is merely a list of the current officers and directors of SIG; it cannot reasonably be read as a promise of continuing employment.

sustain a claim of fraud. Instead, proximate cause is required, meaning that this omission must have been a "substantial factor" in his decisionmaking. *See Cox v. Administrator United States Steel & Carnegie,* 17 F.3d 1386, 1399 (11th Cir.1994); *see also Brandenburg v. Seidel,* 859 F.2d 1179, 1189 (4th Cir.1988) (stating that the inquiry in determining the existence of proximate cause is "whether the conduct has been so significant and important a cause that the defendant should be held responsible" (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 42 (5th ed.1984))). Beck has presented no evidence (other than the "but for" testimony) that one of the substantial factors in his decision to make certain financial commitments to SIG was his belief that the company was run legally.[12]

Finally, the defendants' creation of false financial statements cannot serve as the basis for Beck's allegations of fraud, again because of a lack of evidence of fraudulent intent toward Beck.[13] It is surely true that, if the defendants misrepresented certain transactions and intentionally overstated the value of SIG, they intended to deceive someone. There is no evidence, however, that the someone to be deceived was Beck. The more likely target of deception, based on the evidence, was First Fidelity Bank, from whom SIG was seeking a loan. Beck has also failed to demonstrate

---

[12]Beck has also suggested that the defendants' illegal activities led to SIG's demise, which in turn caused Beck's losses (the reduction in value of his investments and the accountability for the loan he guaranteed). This claim is clearly barred by the proximate cause requirement—the detrimental effects of racketeering activity directed toward a third party (in this case, SIG) are not actionable under RICO. *See Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.,* 140 F.3d 898, 906 (11th Cir.1998). This is the type of derivative claim that the district court correctly held does not confer standing under RICO. *See supra* note 10.

[13]The same is true of the erroneous "Claims Summaries" on which Beck claims to have relied.

9

proximate cause—he has presented no evidence that he actually saw, let alone relied upon, any false

financial statements prior to making his financial decisions.[14]

## C.

Beck also alleges that the defendants violated RICO by creating fraudulent reasons for

terminating his employment. The purported fraud consists of arranging for a consulting group to

issue a report containing false allegations regarding Beck's job performance, and then using this

report as a basis for firing him. It does not appear, however, that Beck was injured through reliance

on the fraudulent report. The only persons who might have relied on the report are the directors of

SIG, when making their decision to terminate Beck. Because Beck did not rely to his detriment on

the alleged misrepresentations, these misrepresentations are not the proximate cause of Beck's

injury. *See Pelletier,* 921 F.2d at 1499-1500.

Furthermore, as with Beck's other claims, there is no evidence of the defendants' intent to

defraud Beck. Indeed, Beck claims not to have been deceived at all—he has long been aware that

the allegations in the consulting report were false, and that the true reason he was fired was that he

posed a threat to the defendants' illegal activities. The apparent object of the defendants' fraud was

a prospective court, one that might someday hear a claim by Beck of breach of contract. In essence,

Beck's claim in regard to his firing is that SIG ought to have been required to repurchase his stock

and breached its contract by not doing so. Whatever the merits of this claim at common law, it is

---

[14]Beck also suggests that the defendants' failure to inform him of the illegal transaction that led to the creation of the inaccurate financial statements constitutes a fraudulent misrepresentation by omission. This claim—that the concealment of SIG's illegal activities constitutes a fraudulent inducement—has already been addressed.

different from a federal statutory claim that the defendants committed mail and wire fraud in firing Beck. Consequently, Beck's firing is not an act of racketeering under RICO.

III.

Beck's allegation that he was fired for pretextual reasons is also the basis for his claim under RICO's conspiracy provision, 18 U.S.C. § 1962(d). A civil RICO conspiracy claim requires a showing of the existence of a conspiracy, and the commission of an overt act in furtherance of the conspiracy that causes injury to the plaintiff. *See Bivens Gardens Office Bldg., Inc. v. Barnett Bank of Fla., Inc.,* 906 F.2d 1546, 1550 n. 7 (11th Cir.1990). Beck argues that the defendants' conspiracy to commit various racketeering activities led to his firing (because Beck refused to participate in such activities and because Beck "blew the whistle" on certain SIG misconduct); he therefore suffered injury resulting from an overt act (the wrongful termination) done in furtherance of the conspiracy. To support this argument, Beck relies on cases from other circuits holding that a terminated "whistle blower" has standing to bring a claim under RICO's conspiracy provision, even if no such claim is available under RICO's substantive provisions.[15]

The Eleventh Circuit, however, has apparently rejected this reasoning, and rightly so—a terminated whistle blower, although he may have a wrongful termination claim, has not suffered an injury that was proximately caused by the defendants' *racketeering* activities. *See Morast v. Lance,* 807 F.2d 926, 933 (11th Cir.1987) (holding that retaliatory discharge for blowing the whistle, standing alone, is not grounds for a RICO conspiracy claim); *O'Malley v. O'Neill,* 887 F.2d 1557,

---

[15]*See Schiffels v. Kemper Fin. Servs., Inc.,* 978 F.2d 344 (7th Cir.1992); *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162 (3d Cir.1989). *Khurana v. Innovative Health Care Systems, Inc.,* 130 F.3d 143, 153-54 (5th Cir.1997), decided subsequent to argument in this case, also supports Beck's claim.

11

1561-62 (11th Cir.1989) (broadening *Morast* 's holding regarding whistle blower claims to include refusal to participate in illegal activity).[16]  There is a substantial debate in the federal courts of appeals regarding whether the overt act necessary for a RICO conspiracy must be an act of racketeering as defined in section 1961(1).[17]  In the context of RICO's substantive provisions, the Supreme Court has held that a plaintiff's injuries must have been proximately caused by acts of racketeering.  *See Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 265-69, 112 S.Ct. 1311, 1316-18, 117 L.Ed.2d 532 (1992).  We believe that this reasoning applies equally well to RICO's conspiracy provisions.   Furthermore, RICO was enacted with an express target—racketeering activity—and only those injuries that are proximately caused by racketeering activity should be actionable under the statute.  *See Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 25 (2d Cir.1990) ("Congress did not deploy RICO as an instrument against all unlawful acts.  It targeted only predicate acts catalogued under section 1961(1)."); *cf.* H.R.Rep. No. 91-1549 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007, 4032 ("If there is no racketeering activity ... there can be no violation of the provisions of this title.").  Although a "whistle blower" claim such as Beck's could perhaps have a deterrent effect on racketeering, we believe that such a claim goes further than what Congress has authorized under RICO. As the Supreme Court noted in *Holmes,* the need to

---

[16]The majority of other circuits considering this issue have also concluded that allegations of retaliatory discharge for interference with racketeering activity ("whistle blower" claims) do not satisfy RICO's proximate cause requirement.  *See Bowman v. Western Auto Supply Co.,* 985 F.2d 383, 388 (8th Cir.1993);  *Miranda v. Ponce Fed. Bank,* 948 F.2d 41, 48 (1st Cir.1991);  *Reddy v. Litton Indus., Inc.* 912 F.2d 291, 294-95 (9th Cir.1990);  *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 25 (2d Cir.1990).

[17]*See* cases cited in notes 15 and 16, *supra;  see also Rehkop v. Berwick Healthcare Corp.,* 95 F.3d 285, 290 (3d Cir.1996);  *Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1344-46 (2d Cir.1994).

deter injurious conduct can be amply met through suits by those persons directly injured. *See Holmes,* 503 U.S. at 269-70, 112 S.Ct. at 1318-19.

The requirement that a civil RICO plaintiff prove injury resulting from a racketeering act does not, as Beck and some courts have suggested, render the RICO conspiracy provision superfluous. *See Khurana v. Innovative Health Care Sys., Inc.,* 130 F.3d 143, 153 (5th Cir.1997); *Bowman v. Western Auto Supply,* 985 F.2d 383, 388 (8th Cir.1993). Rather, the conspiracy provision allows persons who are responsible for an injury, but did not actually participate in the injury-causing activity, to be held liable.[18] Furthermore, requiring proof of direct injury by

---

[18]The function of a conspiracy claim differs in criminal and civil cases. In a criminal context, the purpose of conspiracy charges is to punish the act of agreement itself. *See* Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 6.4(d) (2d ed.1986). Agreements to engage in criminal activity are considered dangerous to society in and of themselves, because of "the special danger incident to group activity." *Id.* at § 6.4(c). Thus, for a criminal conspiracy charge, there is no need to prove that the conspiracy led to an injury-causing criminal activity. In a civil context, however, the purpose of a conspiracy claim is to impute liability—to make X jointly liable with D for what D did to P. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 46 (5th ed.1984). Thus, a civil conspiracy plaintiff must prove that someone in the conspiracy committed a tortious act that proximately caused his injury; the plaintiff can then hold other members of the conspiracy liable for that injury. Those courts that have recognized a claim such as Beck's usually rely on criminal RICO cases, thus demonstrating a possible confusion about the separate functions of civil and criminal conspiracy claims. *See Schiffels,* 978 F.2d at 348 (relying on numerous criminal cases); *Shearin,* 885 F.2d at 1169 (relying on criminal case of *United States v. Brooklier,* 685 F.2d 1208 (9th Cir.1982)).

This distinction also explains why *Salinas v. United States,* 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), relied upon by Beck, is not relevant here. *Salinas* states that criminal RICO conspiracy has no overt act requirement—the agreement itself is sufficient to establish culpability. This is a very different matter from the requirements for civil RICO conspiracy:

[A]lthough an overt act by itself ... is not a requisite element of a section 1962(d) criminal conspiracy violation, we hold that injury from an overt act is necessary and sufficient to establish civil standing for a RICO conspiracy violation. We cannot agree, however, with cases ... that find standing on the basis of *any* overt act in furtherance of the conspiracy, even if it is not a predicate racketeering act.

13

racketeering activity for section 1962(a)-(c), but not for section 1962(d), would (in addition to being logically inconsistent) allow plaintiffs to circumvent the requirements of the first three subsections simply by alleging a conspiracy. *See id.*

As discussed in part II.C, *supra,* Beck has presented no evidence that his termination was the result of racketeering activity directed toward him. Thus, we affirm the district court's grant of summary judgment on Beck's RICO conspiracy claim.

IV.

The district court, upon granting summary judgment on Beck's only federal claim (the RICO claim), declined to exercise supplemental jurisdiction over Beck's remaining state law claims. The exercise of supplemental jurisdiction is left to the discretion of the district court; we review for an abuse of discretion. *See Edwards v. Okaloosa County,* 5 F.3d 1431, 1433 (11th Cir.1993). We find such an abuse here, and therefore reverse the district court's ruling.

The district court's ruling improperly relied on 28 U.S.C. § 1367(c)(3). Section 1367 applies only to civil actions commenced after December 1, 1990. *See* Judicial Improvements Act of 1990, Pub.L. No. 101-650, § 310(c), 104 Stat. 5089, 5114 (1990). Beck's cross-claim was filed on May 28, 1990. Thus, the common law of pendent jurisdiction, rather than section 1367, applies to this case.

Ordinarily, this distinction would be of little importance. *See Kaufman v. Checkers Drive-In Restaurants, Inc.,* 122 F.3d 892, 893 n. 2 (11th Cir.1997) (noting that section 1367 codifies pre-existing criteria for exercising pendent jurisdiction). However, a dismissal under section 1367 automatically tolls the statute of limitations on the dismissed claims for 30 days, *see* 28 U.S.C. §

---

*Hecht,* 897 F.2d at 25 (citation omitted).

14

1367(d) (1994), while a dismissal under the doctrine of pendent jurisdiction does not have this effect. Beck claims that the applicable statute of limitations would bar his state law claims if they were dismissed at this stage. The possibility of a claim being time-barred is an important factor in deciding whether to maintain jurisdiction over pendent claims once the federal claims have been resolved; dismissing state law claims for which the statute of limitations has run will often constitute an abuse of discretion. *See Edwards,* 5 F.3d at 1435; *L.A. Draper & Son v. Wheelabrator-Frye, Inc.,* 735 F.2d 414, 430 (11th Cir.1984); *Pharo v. Smith,* 625 F.2d 1226, 1227 (5th Cir.1980).[19]

The district court presumably did not address the statute of limitations issue because it assumed that Beck's state law claims would be protected under 28 U.S.C. § 1367(d). Because section 1367 is not the applicable law, the district court's decision leaves the status of Beck's state law claims unclear.[20] We therefore reverse the district court's ruling on this issue and remand for further consideration of Beck's pendent state law claims.

V.

The defendants moved for sanctions against Beck under Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927. The district court denied both motions; we review for an abuse of discretion. *See Glatter v. Mroz (In re Mroz ),* 65 F.3d 1567, 1571-72 (11th Cir.1995). We do not find Beck's

---

[19]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[20]If the district court intended to refuse to exercise pendent jurisdiction while still preserving Beck's state law claims for review in state court, it could accomplish this on remand by requiring the defendants to file a waiver of any statute of limitations defense as a condition of dismissal. *See Edwards,* 5 F.3d at 1435 n. 3.

claims to be so meritless that the district court's denial of sanctions constitutes an abuse of discretion.[21]

The defendants also challenge the district court's ruling on their motion to tax costs to the plaintiff. The defendants moved to tax the costs of all depositions taken, of photocopying necessary in conjunction with document production, of serving various subpoenas and summonses, and of the court costs affiliated with appearing *pro hac vice.* The district court taxed to Beck only those costs incurred in deposing him and in photocopying the motion for summary judgment. This ruling is reviewed for an abuse of discretion, *see Tanker Management, Inc. v. Brunson,* 918 F.2d 1524, 1527 (11th Cir.1990); we find no such abuse here.

## VI.

Defendant Byron L. Sparber was dismissed from this action on the ground of inadequate service of process. Beck concedes that service was improper, but argues that Sparber should be barred from claiming inadequate service of process under the doctrine of laches. Specifically, Beck argues that Sparber's delay in raising this issue has created the possibility that Beck's claims against Sparber will be time-barred. Furthermore, Beck argues that Sparber has waived any defense of inadequate service of process through a notice of appearance filed by his attorney (which Sparber and his attorney claim was filed inadvertently) and by the involvement of Sparber's attorney in the case (which Sparber's attorney claims was solely on behalf of another client, defendant Joseph S. Littenberg).

---

[21]The parties dispute which version of Rule 11 (the pre-1993 or post-1993 version) applies, because the defendants concede that they did not comply with the 21-day safe harbor provision found in the post-1993 version. *See* Fed.R.Civ.P. 11(c)(1)(A). We do not reach this issue, because we conclude that, even if the pre-1993 version applies, there was no abuse of discretion.

16

Although we review the district court's interpretation of the Federal Rules of Civil Procedure *de novo, see Silvious v. Pharaon,* 54 F.3d 697, 700 (11th Cir.1995), we review the district court's factual findings only for clear error, *see American Red Cross v. Palm Beach Blood Bank, Inc.,* 143 F.3d 1407, 1410 (11th Cir.1998). The district court's decision in this matter was based primarily on a series of factual determinations—whether Sparber or Beck is to blame for the delay, whether Sparber's notice of appearance was inadvertent, whether Sparber's attorney was solely representing Littenberg during the proceedings, and so forth. We cannot say that the district court's factual findings in this regard were clearly erroneous, and we therefore affirm the district court's dismissal of Sparber from this action.

## VII.

For the foregoing reasons, we AFFIRM the district court's grant of the defendants' motions for summary judgment; we VACATE the district court's dismissal of Beck's state law claims and REMAND the case with the instruction that the district court reconsider its order dismissing Beck's pendent state law claims; we AFFIRM the district court's denial of sanctions; we AFFIRM the district court's ruling on the defendants' motion to tax costs; and we AFFIRM the district court's dismissal of defendant Sparber from this action.

SO ORDERED.