RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0223p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

GROW MICHIGAN, LLC,

           *Plaintiff-Appellant*,

v.

LT LENDER, LLC; JERRY REINHARDT; JOHN REINHARDT; BRUCE CAMPBELL; PAUL SHAMO; ROBERT CAUSLEY; DAMIAN KASSAB; ROBERT DRAKE; SOLYCO, LLC,

           *Defendants-Appellees*.

No. 21-2673

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:20-cv-11391—Linda V. Parker, District Judge.

Argued: March 10, 2022

Decided and Filed: October 7, 2022

Before: BATCHELDER, NALBANDIAN, and READLER, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** Patrick M. McCarthy, HOWARD & HOWARD ATTORNEYS, PLLC, Royal Oak, Michigan, for Appellant. James R. Bruinsma, MCSHANE & BOWIE, PLC, Grand Rapids, Michigan, for LT Lender Appellees. Stuart A. Best, WELTMAN, WEINBERG & REIS, CO., LPA, Troy, Michigan, for Appellee Shamo. Evan A. Burkholder, O'HAGAN MEYER, PLLC, Northville, Michigan, for Appellee Kassab. Nick Gorga, HONIGMAN LLP, Detroit, Michigan, for Appellee Solyco. **ON BRIEF:** H. William Burdett, Jr., Kory M. Steen, HOWARD & HOWARD ATTORNEYS, PLLC, Royal Oak, Michigan, for Appellant. James R. Bruinsma, MCSHANE & BOWIE, PLC, Grand Rapids, Michigan, for LT Lender Appellees. Stuart A. Best, Michael P. Herzoff, WELTMAN, WEINBERG & REIS, CO., LPA, Troy, Michigan, for Appellee Shamo. Evan A. Burkholder, O'HAGAN MEYER, PLLC, Northville, Michigan, for Appellee Kassab. Nick Gorga, Andrew W. Clark, Jewel M. Haji, HONIGMAN LLP, Detroit, Michigan, for Appellee Solyco.

————————————

**OPINION**

————————————

CHAD A. READLER, Circuit Judge.  Grow Michigan (GrowMI) extended a $5,000,000 loan to Michigan-based start-up Lightning Technologies.  Lightning eventually defaulted on the loan.  GrowMI believes that Lightning's default was the result of the actions of individuals and entities associated with Lightning that intentionally drove the company into the ground as part of a scheme to seize control of the company.

To recoup the losses, GrowMI sued those allegedly scheming parties for violating the Racketeer Influenced and Corrupt Organizations Act.  GrowMI's claims, however, rest on its status as Lightning's creditor, making its injury derivative of the harm incurred by Lightning.  Because GrowMI does not plausibly allege that it was directly injured by reason of defendants' alleged racketeering activities, we affirm the district court's dismissal of GrowMI's complaint.

**I.**

At the center of this dispute are two Michigan-based corporations.  One is GrowMI, an entity created and partially funded by the Michigan Economic Development Corporation, an arm of the Michigan state government.  GrowMI's mission is to spur job growth by lending capital to small and mid-sized businesses in Michigan.  The other is Lightning Technologies, a start-up company incorporated in Delaware.  Lightning owns intellectual properties protecting designs for a lightweight, hybrid pallet used for transporting cold foods.

In 2019, Lightning sought $26 million in outside funding to retire debt, cover operational expenses, and purchase equipment needed to begin pallet production.  GrowMI agreed to loan $5 million to Lightning.  It also utilized its relationship with Flagstar Bank to secure an additional $7 million loan for Lightning from Flagstar.

Both GrowMI and Flagstar conditioned their loans on Lightning's securing the rest of the $26 million.  Lightning purportedly planned to raise the remaining capital by selling equity and securing lines of credit from two Lightning shareholders.  All told, Lightning (in theory) was set

to receive $26 million in new funding: a $5 million loan from GrowMI, a $7 million loan from Flagstar, $4 million from equity sales, and $10 million from lines of credit. Damian Kassab, who served as Lightning's executive vice president with exclusive responsibility for the company's financial affairs, represented to GrowMI and Flagstar that, with this additional funding, Lightning would purchase production equipment by the end of 2019, become fully operational by mid-summer 2020, and generate profit by the fall of 2020.

Before Lightning closed on the GrowMI and Flagstar loans, Lightning creditor LT Lender LLC sent GrowMI a "payoff" letter indicating that Lightning owed LT Lender $3.3 million, a debt secured by an interest in Lightning's intellectual properties. That posed a problem for GrowMI, which wanted to secure its loan with the same intellectual properties. So, in conjunction with Lightning's closing on the loan, GrowMI allowed Lightning to use a portion of GrowMI's loan to repay the LT Lender debt, ensuring that GrowMI had a first secured position on Lightning's intellectual properties.

In the months that followed, GrowMI became suspicious of wrongdoing at Lightning. GrowMI was troubled by the fact that Kassab refused to draw on the loan from GrowMI for any purpose other than repaying LT Lender. Likewise, GrowMI began to view the payoff letter it received from LT Lender as containing material misstatements and omissions. For example, although the letter indicated that Lightning owed LT Lender $3.3 million, GrowMI discovered that Lightning in fact owed LT Lender only $2.2 million. To GrowMI, the extra million appeared to be a bribe to LT Lender and its principals, all of whom were also Lightning shareholders. In exchange for the payment, LT Lender agreed to settle what GrowMI describes as a "bogus" claim against Lightning. In addition, the payoff letter neglected to mention that Lightning had licensed its proprietary technology to another company—in which Lightning held a 35% interest and LT Lender a 65% interest—yet had received no payment in return. In GrowMI's mind, these discrepancies cast doubt on a number of representations made to GrowMI to procure the loan.

GrowMI alleges that Kassab never intended to use the loans from GrowMI and Flagstar or the lines of credit to make Lightning operational. Instead, says GrowMI, Kassab and the shareholders agreed that their lines of credit would be used only to induce GrowMI and Flagstar

to lend money to Lightning, and that GrowMI's loan would be used to pay off LT Lender. Tellingly, GrowMI adds, no one at Lightning ever purchased the equipment needed to begin production.

Why did Kassab fail to draw on Lightning's available credit?  GrowMI provides two explanations.  First, financial self-interest.  Kassab owns a separate consulting business—Solyco, LLC—that connects lenders with companies in need of capital.  Rather than use the funds from GrowMI, Kassab, GrowMI theorizes, sought to take on additional debt through lenders referred to Lightning by Solyco.  In return for each referral, Kassab (through Solyco) received a "finder's fee" paid by Lightning.  Case in point, GrowMI alleges that Lightning took on an additional $1.8 million in short-term, high-interest loans from Solyco-referred entities, including another $1 million from a Lightning shareholder in a transaction that generated a $400,000 finder's fee for Kassab.

Second, GrowMI surmises, failing to draw on the loan would aid Kassab and the other defendants in seizing control of Lightning from Jeffrey Owen, the company's president, CEO, and chairman.  By racking up additional debt and then refusing to spend it, says GrowMI, Kassab and his allies could plunge Lightning into financial turmoil and discredit Owen's leadership, allowing them to launch a proxy battle to take control of the company.  And that alleged plan showed initial promise:  by the time GrowMI filed this lawsuit, Lightning was losing $500,000 per month.  The ensuing proxy battle, however, ultimately proved unsuccessful. Although Lightning's board removed Owen, the Delaware Chancery Court later voided that decision and reinstated Owen.

In the midst of this corporate tug-of-war, a Lightning employee, GrowMI alleges, downloaded Lightning's confidential trade secrets to his personal computers "at the behest of other [d]efendants."  GrowMI believes those actions were part of defendants' "backup plan"; if their proxy battle failed, defendants could recreate Lightning's proprietary products on their own using the stolen trade secrets.

As these events were unfolding, Lightning defaulted on its debt to GrowMI.  That shortcoming spurred GrowMI to file a number of state court lawsuits as well as this federal one

to recoup its losses. In this action, GrowMI names nine defendants: LT Lender and its principals; two Lightning shareholders; two Lightning employees, including Kassab; and Kassab's consulting company, Solyco. In its complaint, GrowMI alleged that defendants violated the Racketeer Influenced and Corrupt Organizations Act—RICO, for short—by engaging in a pattern of racketeering activity that included two acts of bank fraud, one act of transactions involving money derived from that bank fraud, one act of trade secrets misappropriation, and one act of wire fraud.

Defendants moved to dismiss GrowMI's complaint. The district court did so, holding that GrowMI failed to state a claim under 18 U.S.C. § 1962. GrowMI now appeals that dismissal.

**II.**

Before we may hear the merits of GrowMI's appeal, we must assure ourselves that GrowMI has Article III standing to bring this suit. U.S. CONST. art. III, § 2; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337–38 (2016). To have standing, GrowMI must satisfy three elements: (1) an injury in fact that is (2) fairly traceable to the defendant's conduct and (3) likely to be redressed by judicial action. *Spokeo*, 578 U.S. at 338.

Defendants turn our focus to the second element: traceability. As it is generally understood, traceability requires that a plaintiff's claimed injury flow from the defendant's conduct rather than the plaintiff's own actions or the actions of a third party. *Turaani v. Wray*, 988 F.3d 313, 316 (6th Cir. 2021); *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020). Beyond that threshold, however, "the plaintiff's burden of alleging that their injury is fairly traceable to the defendant's challenged conduct is relatively modest." *Buchholz*, 946 F.3d at 866 (cleaned up). Any harm flowing from the defendant's conduct, even indirectly, is said to be "fairly traceable." *Id.* (citation omitted).

GrowMI's complaint clears the traceability threshold. The complaint's central allegation is that defendants made misrepresentations in acquiring the loans and then engaged in financial misconduct and trade secret misappropriation, which together precipitated Lightning's default, thereby harming GrowMI in its capacity as a Lightning creditor. Read as a whole, these

allegations are sufficient to show a traceable connection between conduct and injury. *See Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) (explaining that an injury is traceable where the defendant's actions impair a third party's ability to pay the plaintiff).

Even so, defendants contend, GrowMI nonetheless failed to show that its conduct "proximately caused" GrowMI's injury. Rather, they say, GrowMI's injury was merely the indirect result of defendants' alleged fraud, financial misconduct, and trade secrets misappropriation. That point, as we will explain, has salience at the merits stage. But for Article III standing purposes, "[p]roximate causation is not an" element GrowMI must establish. *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 612 (6th Cir. 2004) ("[T]he plaintiff may lose on the merits as a matter of law for lack of proximate cause [in a RICO action], but the injured plaintiff would have the right to file a lawsuit.").

True, as defendants highlight, some courts have used the phrase "RICO standing" when describing the requirement that a RICO plaintiff show a proximate connection between its injury and the defendant's conduct for purposes of pleading and proving a viable RICO claim. *See, e.g.*, *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 129 (2d Cir. 2003), *abrogated on other grounds by Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). But that description in many ways is a misnomer. While proximate causation is an element of a RICO plaintiff's cause of action, *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006), it is not a jurisdictional requirement, *Lerner*, 318 F.3d at 122 & n. 8, 129 (collecting cases) (explaining that a plaintiff can satisfy "the lesser burden for constitutional standing" irrespective of whether defendants' conduct "proximately caused [its] injuries"); *see also Keen v. Helson*, 930 F.3d 799, 802 (6th Cir. 2019).

As to most defendants, then, GrowMI has standing to pursue its RICO claims. But as to Solyco, GrowMI has forfeited the issue. Solyco maintains that its alleged wrongdoing "did not reduce Lightning's capitalization or ability to pay GrowMI." In the district court, GrowMI responded to this argument with only a conclusory remark regarding "Solyco's racketeering activities." Conspicuously absent from GrowMI's response was any explanation of the nature of those alleged racketeering activities, let alone how they caused GrowMI's purported injury. *See Buchholz*, 946 F.3d at 866 (explaining that traceability requires the claimed injury flow from

the defendant's conduct).  Digging an even bigger hole for itself, GrowMI on appeal fails to even acknowledge Solyco's standing argument.  Accordingly, GrowMI has forfeited any argument that it has standing to pursue claims against Solyco.  *See Glennborough Homeowners Ass'n v. U.S. Postal Serv.*, 21 F.4th 410, 414 (6th Cir. 2021).

**III.**

With our jurisdiction assured, we turn to the merits of GrowMI's RICO claims.  We review de novo the district court's order dismissing GrowMI's complaint for failure to state a claim.  *Torres v. Vitale*, 954 F.3d 866, 871 (6th Cir. 2020).  In doing so, we accept as true all well-pleaded allegations in the complaint and ask whether those allegations plausibly suggest an entitlement to relief.  *Id.*  We are not, however, "bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Enacted in 1970, the federal Racketeer Influenced and Corrupt Organizations Act prohibits one from engaging in "a pattern of racketeering activity" in connection with "any enterprise" whose activities affect interstate commerce.  18 U.S.C. § 1962(a).  Breaking down those statutory components into consumable pieces, the statute defines a "pattern of racketeering activity" as "at least two acts of racketeering activity" that occur within ten years of one another. *Id.* § 1961(5).  "Racketeering activity" means any of a set of specified state and federal crimes set forth in § 1961(1).  And the term "enterprise" denotes any legal entity, such as a corporation, or "any union or group of individuals associated in fact although not a legal entity." *Id.* § 1961(4).

RICO's prohibitions may be enforced in both criminal and civil contexts.  For parties seeking civil remedies, RICO creates a private cause of action:  "Any person injured in his business or property by reason of a violation of section 1962" may sue for treble damages and attorney's fees. *Id.* § 1964(c).  Drawing from this textual backdrop, then, to state a civil RICO claim, a plaintiff must allege (1) two or more predicate racketeering offenses, (2) the existence of an enterprise affecting interstate commerce, (3) a connection between the racketeering offenses and the enterprise, and (4) injury by reason of the above.  *See Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006); *Frank v. D'Ambrosi*, 4 F.3d 1378, 1385 (6th Cir. 1993).

**A.**  In its complaint, GrowMI alleges that defendants committed five separate predicate racketeering offenses:  two acts of fraud against a financial institution, 18 U.S.C. § 1344, transactions using money derived from that fraud, 18 U.S.C. § 1957, trade secrets misappropriation, 18 U.S.C. § 1832, and wire fraud, 18 U.S.C. § 1343.  So long as GrowMI can plausibly allege two of those five predicate acts, and, from the foundation of those two acts, the remaining elements of a RICO claim, it can meet its pleading obligations.  *See* 18 U.S.C. §§ 1961(5), 1962.  As to at least the first four purported racketeering offenses, however, GrowMI has not alleged facts sufficient to show that it was injured by reason of those offenses.

Begin with some background RICO principles.  Section 1964(c)'s causation standard—that the plaintiff suffer injury "by reason of" the defendant's racketeering—is demanding.  To satisfy this statutory requirement, a plaintiff, we have recently reaffirmed, must show "that the defendant's violation was both a factual and proximate cause of his injury."  *Gen. Motors, LLC v. FCA US, LLC*, 44 F.4th 548, 559 (6th Cir. 2022).  And proximate cause, as an aspect of RICO's "by reason of" standard, has been understood to require a RICO plaintiff to show that the defendant's racketeering offense "led directly to the plaintiff's injuries."  *Anza*, 547 U.S. at 461.  In that way, RICO's directness requirement elevates a plaintiff's burden by requiring more than a showing of mere foreseeability, the crux of common law causation principles.  *See id.*; *Perry v. Am. Tobacco Co., Inc.*, 324 F.3d 845, 850 (6th Cir. 2003) ("Though foreseeability is an element of the proximate cause analysis, it is distinct from the requirement of a direct injury."); *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 348 (2d Cir. 2003) ("In fact, the proximate cause requirements of RICO [a]re more stringent than those of most states.").

Requiring a direct causal link between a defendant's RICO violation and a plaintiff's injury avoids a host of practical hurdles federal courts would otherwise face in resolving RICO claims.  One is "the difficulty [in] attempt[ing] to ascertain the damages caused by some remote action."  *Anza*, 547 U.S. at 458.  Take *Anza*, for example.  There, the Supreme Court observed that a company's indirect injury—loss of sales when a competitor lowered prices—raised difficulties in determining damages, as the competitor "could have lowered prices for any number of reasons unconnected" to the alleged RICO violation.  *Id.* at 458–59.

Another difficulty is the "risk of duplicative recoveries." *Id.* at 459. If RICO allowed recovery by victims "removed at different levels of injury from the violative acts," courts would be forced "to adopt complicated rules apportioning damages" among those victims. *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 269 (1992). And a third is the recognition that more "immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." *Anza*, 547 U.S. at 460. For that reason, "[t]here is no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly." *Id.*

As to at least four of the five purported predicate acts, GrowMI has failed to allege that it was injured "by reason of" those acts. The "by reason of" standard precludes recovery where a plaintiff's injuries are merely the "derivative or passed-on" result of the alleged racketeering activity. *Trollinger*, 370 F.3d at 614. That description encapsulates the nature of GrowMI's claimed injuries. According to GrowMI, it incurred injuries due to a cascading series of wrongful acts committed by defendants to harm Lightning.

As GrowMI describes things, defendants violated 18 U.S.C. § 1344 (bank fraud) when Kassab falsely represented to Flagstar that the $10 million in lines of credit Lighting had secured would, along with the loans from Flagstar and GrowMI, be used to begin pallet production. Defendants then violated 18 U.S.C. § 1957 (unlawful transactions) by using those funds in a series of illegal transactions—bribes for friendly creditors, selective payments to Lightning shareholders, and self-dealing—designed to further their takeover attempt. Next, defendants violated 18 U.S.C. § 1832 (trade secrets misappropriation) by downloading Lightning's intellectual property to personal computers. (GrowMI's complaint does not allege that Lightning as a corporation was complicit in defendants' wrongdoing.) Collectively, says GrowMI, these violations both drained Lightning's coffers, leaving GrowMI unable to recover the value of its loans, and compromised the value of Lightning's intellectual properties, which served as the collateral for GrowMI's loan.

Setting aside any potential shortcomings with respect to establishing a RICO conspiracy, GrowMI has a more immediate problem. At bottom, its allegations amount to a claim that these four predicate acts injured GrowMI in its capacity as Lightning's creditor:	defendants

compromised Lightning's financial condition, leaving Lightning unable to repay GrowMI's loan. Yet the injury a creditor suffers due to a corporation's default caused by another party's actions is considered derivative, not direct, for purposes of RICO causation. In that scenario, the acts of racketeering target the corporation, not the creditor. *See Beck v. Prupis*, 162 F.3d 1090, 1096 n.10 (11th Cir. 1998), *aff'd* 529 U.S. 494 (2000). "The first level of injury is to the corporation, and the creditor suffers only because he has a claim against it." *Wooten v. Loshbough*, 951 F.2d 768, 771 (7th Cir. 1991). Put another way, there is no "straight line" between the defendant's violations and the creditor's injury, thus "precluding a finding of proximate cause." *Gen. Motors*, 44 F.4th at 560 (internal citation omitted). These same considerations have likewise led our sister circuits to conclude that a RICO claim is customarily unavailable to creditors following a corporate default. *See Wooten*, 951 F.2d at 771 (holding that corporate creditors "cannot sue under RICO when their only injury comes about through the depletion of corporate assets"); *see also Beck*, 162 F.3d at 1096 n.10 (same); *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1419–20 (9th Cir. 1995) (same); *Manson v. Stacescu*, 11 F.3d 1127, 1130–31 (2d Cir. 1993) (same); *Nat'l Enters, Inc. v. Mellon Fin. Servs. Corp. No. 7*, 847 F.2d 251, 254–55 (5th Cir. 1988) (same); *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*, 877 F.2d 1333, 1336 (7th Cir. 1989) (same). And those decisions, it bears adding, are in line with our holdings in other contexts that derivative losses are not direct injuries for RICO purposes. *See, e.g.*, *Frank*, 4 F.3d at 1385 (shareholder-employee suffered only derivative injury as a result of company's loss); *Perry*, 324 F.3d at 849 (non-smoking-insurance policy holders suffered only derivative loss when forced to pay higher premiums to subsidize increased costs of treating smoking-related illnesses); *Firestone v. Galbreath*, 976 F.2d 279, 285 (6th Cir. 1992) (no direct injury to estate's beneficiaries when estate suffered monetary loss).

If there is any proper plaintiff to assert claims for the wrongdoing alleged by GrowMI, RICO's causation principles suggest that it is Lightning. After all, Lightning, as the "immediate victim[]" of defendants' alleged violations, "can be expected to vindicate the laws by pursuing [its] own claims." *Anza*, 547 U.S. at 460; *see also Holmes*, 503 U.S. at 274 (explaining that RICO's remedial goals are accomplished as long as those who suffer direct injury may sue, even if those who suffer indirect injury may not). Holding otherwise, it bears noting, would dramatically expand RICO's scope. As we have more generally observed, "[a]llowing every

shareholder, employee and creditor a cause of action for injuries derivative of those suffered directly by a corporation" would both authorize "a vast amount of [federal] litigation . . . that previously could only have been brought in state court" and also "create[] a potential avalanche of suits that previously could not have been brought *at all*." *Warren v. Mfrs. Nat'l Bank of Detroit*, 759 F.2d 542, 545 (6th Cir. 1985). Those ramifications are especially worrisome in the RICO setting, where the statutory scheme authorizes treble damages as well as awards of attorney's fees and costs. 18 U.S.C. § 1964(c); *see also H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 233 (1989) (explaining that RICO's civil remedies are "drastic"); *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) ("[W]e must . . . exercise caution to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions." (cleaned up)). What is more, were GrowMI allowed to pursue its claims alongside Lightning, we would risk "duplicative recoveries" for the same harm. *Anza*, 547 U.S. at 459.

**B.** GrowMI offers two responses. Both suffer from the same flaw: forfeiture.

First, as to causation, GrowMI argues that it was directly injured by the alleged trade-secrets misappropriation because, at the time of the misappropriation, GrowMI's security interest in Lightning's intellectual property had vested. In other words, GrowMI says, because Lightning had defaulted on its debt, ownership of the misappropriated trade secrets transferred to GrowMI. GrowMI, however, failed to raise this argument before the district court—either in its complaint or its briefing on the motion to dismiss—so the argument is forfeited. *See Greco v. Livingston County*, 774 F.3d 1061, 1064 (6th Cir. 2014).

Second, GrowMI argues that even putting aside the other alleged predicate acts, its wire fraud allegation can support RICO's pattern of racketeering activity requirement. GrowMI insists that it in fact alleged multiple acts of wire fraud, acts that together establish a pattern of racketeering activity. Whether GrowMI is correct that, as a legal matter, multiple acts of wire fraud can establish a "pattern of racketeering activity" and, in turn, that in this case it was directly injured by defendants' wire fraud, ordinarily would be fair points for discussion. *Compare Fleischhauer v. Feltner*, 879 F.2d 1290, 1298 (6th Cir. 1989) (holding that nine discrete acts of wire fraud established a pattern of racketeering activity where the acts were committed over a long period of time by multiple defendants and injured 19 victims), *with*

*W. Assocs. Ltd. P'ship, ex rel. Ave. Assocs. Ltd. P'ship v. Mkt Square Assocs.*, 235 F.3d 629, 634 (D.C. Cir. 2001) (explaining that multiple acts of fraud do not establish a pattern when those acts are directed towards "a single scheme, a single injury, and few victims"). But as GrowMI failed to argue as much in the district court, we need not reach these issues. At every turn in the district court, GrowMI indicated that it "has pled five RICO claims"—two allegations of bank fraud and one allegation each of unlawful transactions, trade secrets misappropriation, and wire fraud. The district court acknowledged as much in dismissing the case, noting that, in light of the court's rejection of the first four predicate acts, GrowMI was left with only "one predicate act: wire fraud in violation of 18 U.S.C. § 1343," yet "*at least* two predicate acts are required to establish a pattern of racketeering activity." We therefore decline to address GrowMI's argument here. *See Hall v. Warden, Lebanon Corr. Inst.*, 662 F.3d 745, 753 (6th Cir. 2011) ("[We] review the case presented to the district court, rather than a better case fashioned after a district court's unfavorable order." (internal citation omitted)).

\*          \*          \*          \*          \*

To sum up, because GrowMI was not directly injured by reason of defendants' bank fraud, unlawful transactions, or trade secrets misappropriation, all that remains for predicate act purposes is one count of wire fraud. And as a RICO plaintiff must allege "at least two acts of racketeering activity," 18 U.S.C. § 1961(5); *see also Moon*, 465 F.3d at 723, the district court properly dismissed GrowMI's complaint on that basis.

Ongoing state court litigation may well vindicate GrowMI's interests. But at least as a matter of federal RICO law, GrowMI has failed to plead a viable theory of recovery. On that basis, we affirm the judgment of the district court.