636 So.2d 112 (1994)
OCEAN ELECTRIC COMPANY, Appellant,
v.
HUGHES LABORATORIES, INC., Appellee.
No. 93-93.
District Court of Appeal of Florida, Third District.
April 12, 1994.
Rehearing Denied May 17, 1994.
*113 Gaebe, Murphy, Mullen & Antonelli and Michael J. Murphy, Coral Gables, for appellant.
Brigham & Brigham and Dana P. Brigham, Miami Lakes, James C. Adkins, Tallahassee, for appellee.
Before BASKIN, JORGENSON and LEVY, JJ.
LEVY, Judge.
In this negligence action for damage to goods held for resale, we reverse the trial court's award of damages based upon our finding that the fair market value of goods held for retail sale, where there is no claim for lost profits, is not the retail selling price, but is determined based upon the reasonable cost of replacement to the owner, plus any special expenses incurred.
Appellee Hughes Laboratories, Inc. [Hughes], markets only one product, Replex, which is used as a cure for fever blisters. Replex was manufactured by special order, purchased by Hughes, and held for repackaging and resale. Hughes stored the Replex in bottled bulk form, in a leased space. In August of 1985, an employee of appellant Ocean Electric Company [Ocean Electric], who had been working on the floor above the leased space, lost his balance and started to fall. The employee grabbed a sprinkler head in an attempt to regain his balance, and the sprinkler head broke, flooding the space where some of the Replex was stored. A portion of the Replex inventory was damaged by water.
Hughes brought suit, and Ocean Electric admitted its responsibility for the damage to the inventory. Hughes stipulated that the damages would be limited to the fair market value of the damaged goods, and did not seek lost profits.[1] The trial court entered a partial summary judgment as to liability, and the matter proceeded to trial solely on the issues of the number of bottles of Replex damaged by the water, and the proper measure of damages per bottle.
Hughes contended that the damages should be based upon a figure of $4.06 per bottle, which was the retail sales price that Hughes charged when it resold the product, minus the cost of selling (i.e., shipping costs, sales commissions and costs of sales). Ocean Electric argued that, as far as Hughes' damages were concerned, the fair market value of the Replex should be determined based upon Hughes' replacement cost, which was the $.635, per bottle, that Hughes would have to pay to replace the damaged bottles. The trial court ruled as a matter of law that the measure of damages was to be determined by using the retail sales price at which Hughes sold the product, and assessed the fair market value at $4.06 per bottle. The case then went to the jury only on the question of the number of bottles damaged in the incident. Evidence was presented estimating that the number of bottles lost ranged from 35,000 bottles to 262,000 bottles. The jury returned a verdict finding that 35,650 bottles were damaged, and final judgment was entered in favor of Hughes for $214,743.59, which included prejudgment interest and costs, minus setoffs for settlements with codefendants. Ocean Electric appeals the trial court's determination that the fair market *114 value of the damaged goods was the retail selling price that would have been received if Hughes had resold the bottles. Hughes cross-appeals the jury finding as to the number of Replex bottles damaged.
We first address the issue raised in the main appeal regarding the proper measure of damages. The objective in calculating the proper measure of damages is to place the plaintiff in the same financial position as that occupied before the property was damaged. Argonaut Ins. Co. v. May Plumbing Co., 474 So.2d 212 (Fla. 1985). As stated by the Florida Supreme Court in Jacksonville, T. & K.W. Ry. v. Peninsular Land, Transp. and Mfg. Co., 27 Fla. 1, 119, 9 So. 661, 679 (1891) (emphasis in original):
The law as to what is the `measure of damage' ... in cases where the property of one has been destroyed, unintentionally, but by the negligence or carelessness of another, ... is well settled to be `just compensation in money for the property destroyed;' such an amount as will fully restore the loser to the same property status that he occupied before the destruction.
See also Mercury Motors Express, Inc. v. Smith, 393 So.2d 545 (Fla. 1981) (objective of compensatory damages is to make injured party financially whole); Renuart Lumber Yards v. Levine, 49 So.2d 97 (Fla. 1950) (objective of compensatory damages is to place injured party in position financially equal to that occupied prior to injury).
In order to achieve the objective of restoring the plaintiff to a financially equal position had the damage not occurred, damages for loss of personal property are to be measured based upon the market value of the property on the date of the loss. Jacksonville, T. & K.W. Ry. v. Peninsular Land, Transp. and Mfg. Co., 27 Fla. at 119-21, 9 So. at 679; Allied Van Lines, Inc. v. McKnab, 331 So.2d 319 (Fla. 2d DCA 1976), aff'd, 351 So.2d 344 (Fla. 1977); McDonald Air Conditioning, Inc. v. John Brown, Inc., 285 So.2d 697 (Fla. 4th DCA 1973). The market value of property or goods is determined by looking at the price which would be agreed upon at a voluntary sale between a willing seller and a willing purchaser. See Jacksonville, T. & K.W. Ry. v. Peninsular Land, Transp. and Mfg. Co., 27 Fla. at 1, 9 So. at 661; State v. Book, 523 So.2d 636, 638 (Fla. 3d DCA), rev. denied, 534 So.2d 398 (Fla. 1988). See also Charles T. McCormick, Damages § 44 (1935) (market value defined as sale by leisurely seller to willing buyer).
However, because property or goods may be sold in many different markets at many different prices, the price a willing purchaser will pay a willing seller may vary. As noted at Restatement (Second) of Torts § 911 cmt. d (1979), the market value of property varies because:
[D]ifferent prices are paid by the wholesaler, the retail dealer and the consumer. Since the measure of recovery is determined by the harm done, the market that determines the measure of recovery by a person whose goods have been taken, destroyed or detained is that to which he would have to resort in order to replace the subject matter. Thus the consumer can recover the retail price; the retail dealer, the wholesale price. The manufacturer, who does not buy in a market, receives his selling price.
It follows that the mere assertion that an award of damages is to be based upon "market value" is inconclusive. The measurement of damages is dependent upon the choice of the appropriate economic market which will achieve the objective of making the injured party whole, while avoiding any unjust enrichment.
The appropriate economic market to be used in approximating reasonable market value is the usual market where the property or goods had been purchased. See Skaggs Drug Ctrs., Inc. v. City of Idaho Falls, 90 Idaho 1, 407 P.2d 695 (1965). The usual market for the owner of goods held for subsequent resale, is the wholesale selling market, because a retailer will replace destroyed or damaged goods at the wholesale price, and thus be restored to the prior financial position.
Applying these principles to the present case, the fair market value of Hughes' damages must be calculated based upon the usual market where Hughes purchased the Replex, *115 which was the wholesale selling market, where Hughes could purchase Replex for $.635 per bottle. Therefore, it was error for the trial court to use the retail market price as a guide in measuring the damages to Hughes' goods. A finding to the contrary allowing Hughes to recover the retail value of the damaged goods, would result in unjust enrichment since Hughes would be recovering a profit without having incurred the expense of selling the goods. See Millison v. Ades of Lexington, Inc., 262 Md. 319, 277 A.2d 579 (1971). In other words, such a result would, in essence, allow Hughes to recover "lost profits" that were never lost in the first place. As recognized by several authorities, damages for a retail dealer's anticipated profits on goods held for sale are generally not allowed because:
when a court is dealing with a stock of goods held for sale, or even with a portion of such a stock, the value to be found is its value as a stock or part of a stock of goods, that is, its wholesale value, without the profit of resale which enters into retail value; for at the time of valuation that profit has not yet been earned, or, to put the matter in another way, the process of distribution, which brings the goods into the hands of the consumer and thus gives them their final increment in value, has not yet taken place.
1 Sedgewick on Damages § 248a (9th ed. 1912). See also Restatement (Second) of Torts § 911 cmt. d (1979) ("Damages for the profits that the wholesale dealer or the retail dealer would normally anticipate from a sale are not ordinarily allowed."); Dan B. Dobbs, Remedies § 5.10, at 376 (1973) (award of retail price as damages to retail dealer results in overcompensation by allowing retailer to "gain the profit without the risk or work normally involved").
No case in Florida has directly considered the question of whether, in a situation involving damage to a stock of goods held for sale, the term "market value" denotes the value of the goods in the market in which the owner had purchased them, or the value of the goods in the retail market where they probably would have been sold. In cases involving personal property, Florida courts have held that it is improper to assess market value based solely on evidence presented as to the original cost to the owner, or the owner's replacement cost. See Loury v. Loury, 431 So.2d 701 (Fla. 2d DCA 1983); McDonald Air Conditioning, Inc. v. John Brown, Inc., 285 So.2d at 697; Allstates Van Lines Corp. v. Lebenstein, 303 So.2d 33 (Fla. 3d DCA 1974). See also Charles T. McCormick, Law of Damages § 44, at 166-67 (1935) (market value is usual standard in assessing damages and "excludes as a test of the worth of a thing such possible criteria as cost to the owner").
The cases cited above did not involve damages to goods held for resale, and are consistent with our analysis in the present case. Moreover, decisions from other jurisdictions, which have addressed this issue, support our conclusion that a retailer is normally only entitled to recover the wholesale market value costs of replacing damaged property. See Whaley v. Crutchfield, 226 Ark. 921, 294 S.W.2d 775 (1956); Skaggs Drug Centers, Inc. v. City of Idaho Falls, 90 Idaho at 1, 407 P.2d at 695; Chicago Title & Trust Co. v. W.T. Grant Co., 2 Ill. App.3d 483, 275 N.E.2d 670 (1971); Millison v. Ades of Lexington, Inc., 262 Md. at 319, 277 A.2d at 579; Farer v. Benton, 740 S.W.2d 676 (Mo. Ct. App. 1987); Dubiner's Bootery, Inc. v. General Outdoor Advertising Co., 10 A.D.2d 923, 200 N.Y.S.2d 757 (N.Y. App. Div. 1960); Kaplan v. City of Winston-Salem, 286 N.C. 80, 209 S.E.2d 743 (1974); J.M. Radford Grocery Co. v. Hothan, 42 S.W.2d 119 (Tex. Ct. App. 1931). See also Dan B. Dobbs, Remedies § 5.10 (1973) (where damaged goods are held as a stock for sale, assessment of fair market value based on retail market is improper; market value of a stock of goods held for resale is determined based on wholesale or replacement cost); Charles T. McCormick, Law of Damages § 44 (1935) (same; value of stock of goods is not measured by retail value); 1 Sedgewick on Damages § 248a (9th ed. 1912) (same; value of stock of goods is wholesale value "without the profit of resale which enters into the retail value"); Restatement (Second) of Torts § 911 cmt. d (1979) (same; measure of recovery based upon retail dealers usual market which is the wholesale market); 4 Sutherland, Law of Damages § 1098 (1916) (same).
In conclusion, we hold that the proper market for determining the market *116 value of a stock of goods held for sale is the wholesale market to which the injured party would have to go to in order to replace the goods. The owner of a stock of goods held for sale, which has been damaged or destroyed, is entitled to recover, as damages, the reasonable cost of replacing such goods, which includes the wholesale cost at the time of the loss, plus any other reasonable expenses incurred in the replacement. Thus, the trial court erred in determining the fair market value of Hughes' damaged goods based upon Hughes' retail selling price. Accordingly, that portion of the case, relating to the measure of damages, is reversed and, furthermore, remanded with directions to the trial court to enter an appropriate order reflecting that $.635 per bottle is the proper amount of damages for Hughes to recover for each of the 35,650 bottles that, as found by the jury, were damaged.
Regarding the issues raised in the cross-appeal, we find substantial competent evidence in the record to support the jury verdict and, accordingly, affirm the jury verdict as to the number of bottles damaged.
Affirmed in part; reversed in part, and remanded with directions.
NOTES
[1] Hughes agreed that the number of orders that it received from its customers never exceeded the number of undamaged bottles that Hughes had on hand in inventory. Since there was never an order received by Hughes that it was unable to fill because of insufficient inventory, no sales were lost, or in any way interfered with, because of the damage done to some of its bottles. Hence, there were no "lost profits".