881 So.2d 565 (2004)
Palmas Y BAMBU, S.A., a Costa Rican company, and Productora de Semillas, S.A., a Costa Rican company, Appellants/Cross-appellees,
v.
E.I. DUPONT DE NEMOURS & COMPANY, INC., a Delaware corporation, Appellee/Cross-appellant.
Nos. 3D02-1026, 3D02-1027, 3D02-1172, 3D02-1177.
District Court of Appeal of Florida, Third District.
May 26, 2004.
Rehearing Denied August 13, 2004.
*568 Podhurst Orseck Josefsberg Eaton Meadow Olin & Perwin and Aaron S. Podhurst; Colson Hicks Eidson and Marc Cooper and Maureen E. Lefebvre; Kozyak Tropin & Throckmorton and Janet L. Humphreys and Harley S. Tropin and Adam M. Moskowitz and Detra P. Shaw-Wilder, for appellants/cross-appellees.
Shook Hardy & Bacon and Edward A. Moss and Thomas M. Sherouse and Daniel B. Rogers; Hicks & Kneale and Mark Hicks and Dinah Stein, for appellee/cross-appellant.
Before SCHWARTZ, C.J., and COPE, and WELLS, JJ.
WELLS, Judge.
Palmas Y Bambu, S.A., and Productora De Semillas, S.A., two Costa Rican plant nurseries, appeal from an order directing a verdict in E.I. DuPont de Nemours, Inc.'s favor on the nurseries' RICO claims in this multi-count action for damages to ornamental plants allegedly caused by use of DuPont's Benlate 50 DF fungicide. DuPont cross-appeals from a $26,450,289 judgment in Palmas' and Productora's favor, claiming that a number of evidentiary errors and use of an adverse inference jury instruction regarding the purported 1992 testing of Benlate in Monte Vista, Costa Rica, mandate reversal. We affirm the directed verdict on Palmas' and Productora's RICO claims because the nurseries failed to establish that their injuries were directly caused by the predicate acts proved below and because they failed to establish the existence of an enterprise distinct from the entity charged with violating Florida's RICO act. Moreover, to the extent that the RICO claims were in actuality claims of improper labeling, the claims are preempted by federal legislation. We also find that the adverse inference instruction given to the jury regarding alleged Benlate testing in Monte Vista, Costa Rica, was erroneous and mandates reversal of the remainder of the judgment against DuPont.

Background
Palmas and Productora maintain that DuPont had knowledge of a defect in its early formulation of the commercial plant fungicide Benlate WP; that DuPont recklessly reformulated Benlate to create Benlate DF, also a defective product; and that after Benlate DF users reported plant damage, DuPont perpetuated a coverup and distributed Benlate DF in Costa Rica by misrepresenting and concealing the defective nature of the product, resulting in substantial damage to their nursery plants. Productora sued DuPont in Miami-Dade County Circuit Court, Case No. 97-18186; Palmas sued DuPont in Miami-Dade County Circuit Court, Case No. 97-18181. Each alleged product defect, negligence, and common law fraud claims. The nurseries also sought treble damages under the Florida RICO (Racketeer Influenced and Corrupt Organization) Act. The cases were consolidated for discovery, then later for trial before the same jury.
Pretrial, the nurseries alleged that in 1992 DuPont conducted secret Benlate tests in Monte Vista, Costa Rica, and that DuPont had destroyed both the plants and test results that established Benlate's defective *569 nature. The nurseries sought to strike DuPont's pleadings, to have DuPont sanctioned for destruction of evidence, and to have an adverse inference jury instruction read to the jury. DuPont vehemently denied that any Benlate testing had taken place at Monte Vista or that any test results existed. Following a number of evidentiary hearings on this matter, the trial court concluded that DuPont had conducted Benlate tests in Monte Vista and had destroyed the results of those tests. Finding that DuPont's denials about the testing and the results had not deceived anyone, the trial court denied the request to strike DuPont's pleadings and decided instead on what it described as the "less draconian sanction" of giving a permissive adverse inference jury instruction. That instruction advised the jury that Benlate testing had occurred at Monte Vista; that "DuPont had the obligation to preserve the evidence from those tests, but nonetheless destroyed the evidence"; and that the jury could, but was not obligated to, infer from these facts that the test results were unfavorable to DuPont.
Following a six-week trial, the jury returned a verdict for the nurseries on all claims. Thereafter, in response to DuPont's motions to set aside the verdict, for new trial, and for remittitur, the trial court set aside the RICO verdict and its trebling of damages. The trial court also decreased the damages awarded to Productora by $110,791, while otherwise rejecting DuPont's post-trial motions to set aside the verdict or grant a new trial. Judgment was entered against DuPont in favor of Palmas in the amount of $12,600,000, and against DuPont in favor of Productora in the amount of $13,850,289. The nurseries appeal from the directed verdict on the RICO claims; DuPont appeals from the $26,450,289 judgments in the nurseries' favor.

I.

The Nurseries' Appeal
The nurseries appeal from the trial court's order directing a verdict on their RICO claims, arguing that the trial court erred in concluding that reliance was an element of a civil RICO claim  an element they say they proved. We disagree and affirm the directed verdict not only because the nurseries failed to establish causation, that is, damage flowing from reliance, but also because they failed to prove that the RICO defendant, or person, DuPont was distinct from the RICO enterprise, and because the RICO count, at least in part, is preempted by federal law.

A.

Causation: Damage Flowing From Reliance
The nurseries sought a treble damages award against DuPont in this products liability case under the provisions of section 772.104 of the Florida Statutes. That section provides that "[a]ny person who proves by clear and convincing evidence that he or she has been injured by reason of any violation" of Florida's RICO act, may recover "threefold the actual damages sustained...." § 772.104, Fla. Stat. (2003). Thus, to recover, the nurseries had to prove that they were injured "by reason of" DuPont's alleged criminal activities.
Where, as here, a private party alleges mail or wire frauds as the criminal, or predicate, acts underpinning a civil RICO claim, that party must prove more than the defendant's intentional participation in a scheme to defraud in violation of the federal mail or wire fraud statutes. The claimant must also show that his injury was caused by, that is, his damage was "by reason of," the predicate mail or wire fraud acts. To sustain this burden, reliance *570 on the predicate mail or wire fraud acts must be demonstrated:
When a private plaintiff relies on a violation of the mail or wire fraud statutes as a predicate act for civil RICO, he faces an additional hurdle before he can obtain recovery: he must show not only that the mail or wire fraud statutes have been violated, but also that he has suffered injury as a result of the violation. Section 1964(c)[the federal counterpart of section 772.104 of the Florida Statutes] provides civil remedies to those persons who are injured "by reason of" racketeering activity.... A civil RICO plaintiff must show ... that he was injured by reason of the defendant's acts of deception. As the Supreme Court stated in Sedima [Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)], "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." The Court went on to hold that the plaintiff's damages must "flow from the commission of the predicate acts." Section 1964(c), as interpreted by the Supreme Court and lower courts, thus imposes a proximate cause requirement: the plaintiff's injury must have been proximately caused by the commission of the predicate acts.
There is some question whether the proximate cause requirement limits damages recoverable to those caused directly by the predicate act (e.g., by reliance on fraudulent misrepresentations) or to those caused indirectly by the predicate act (e.g., by purchasing property at a price that has been artificially inflated by a scheme to defraud). We have taken the more restrictive view, holding that a plaintiff has standing to sue under section 1964(c) only if his injury flowed directly from the commission of the predicate acts. This means that, when the alleged predicate act is mail or wire fraud, the plaintiff must have been a target of the scheme to defraud and must have relied to his detriment on misrepresentations made in furtherance of that scheme. See O'Malley v. O'Neill, 887 F.2d 1557, 1563 & n. 9 (11th Cir.1989) ....
Pelletier v. Zweifel, 921 F.2d 1465, 1499 (11th Cir.1991)(emphasis added) (some citations omitted).[1]
As this court has confirmed, "indirect injuries, that is injuries sustained not as a direct result of predicate acts ... will not allow recovery under Florida RICO." O'Malley v. St. Thomas Univ., Inc., 599 So.2d 999, 1000 (Fla. 3d DCA 1992)(adopting the reasoning in O'Malley v. O'Neill, 887 F.2d 1557 (11th Cir.1989)).
*571 In a civil RICO action predicated upon mail or wire fraud, "[t]he plaintiff has the burden of proving: (1) that the defendant intentionally participated, (2) in a scheme to defraud, (3) the plaintiff of money or property, (4) by means of material misrepresentations, (5) using the mails or wires, (6) and that the plaintiff relied on a misrepresentation made in furtherance of the fraudulent scheme, (7) that such misrepresentation would have been relied upon by a reasonable person, (8) that the plaintiff suffered injury as a result of such reliance, and (9) that the plaintiff incurred a specifiable amount of damages." Sikes v. Teleline, Inc., 281 F.3d 1350, 1360-61 (11th Cir.2002)(footnotes omitted); see Green Leaf Nursery v. E.I. DuPont De Nemours and Co., 341 F.3d 1292, 1306 (11th Cir.2003)(to establish a RICO fraud claim predicated on mail or wire fraud, plaintiffs must make the same showing of reasonable reliance that is required to establish common law fraud). Thus, where a civil RICO plaintiff fails to prove that he actually saw or was aware of, let alone relied upon, any false mail or wire communication, judgment is properly entered against him. Beck v. Prupis, 162 F.3d 1090, 1097 (11th Cir.1998); Special Purpose Accounts Receivable Co-op. Corp. v. Prime One Capital Co., L.L.C., 202 F.Supp.2d 1339, 1349 (S.D.Fla.2002)(secured creditors lacked standing to assert alleged acts of mail and wire fraud as predicate acts supporting their claims against joint venture company, vehicle leasing corporation, and corporate officer for violations of RICO, inasmuch as creditors could not have relied upon misrepresentations that allegedly were made by defendants to third-party lessees as part of the underlying scheme to defraud creditors of their lease proceeds and motor vehicles); TransPetrol, Ltd. v. Radulovic, 764 So.2d 878, 881 (Fla. 4th DCA 2000) (dismissing civil RICO claim upon finding that, like the plaintiff in Beck, TransPetrol did not allege that it had relied on defendants' alleged false statements or documents, and thus the production of false documents could not have been the proximate cause of TransPetrol's injury); State v. American Tobacco Co., No. CL95-1466 AH, 1996 WL 788371, at *1 (Fla.Cir.Ct. Dec.13, 1996)("a private party suing for relief under Florida's RICO Act must allege and prove proximate cause and detrimental reliance when seeking civil damages under the Act on a fraud theory")(emphasis in original).
The nurseries based their RICO claims on nine "predicate" acts:
(1) a letter, dated August 11, 1989, from T.R. Vaux, DuPont's Benlate sales manager, to purchasers of Benlate 50 DF, stating that a number of batches of the product were contaminated with low levels of atrazine (Plaintiffs' Exhibit 108);
(2) a letter, dated August 24, 1989, from Ron Hamlen, DuPont's registration specialist, to the EPA, stating that a small portion of the 1989 Benlate 50 DF was contaminated with low levels of atrazine (Plaintiffs' Exhibit 121);
(3) a letter, dated December 27, 1989, from John A. Krol, DuPont's vice president of Ag Products, to all purchasers of Benlate 50 DF, stating that a small portion of Benlate was inadvertently contaminated with atrazine herbicides and had been recalled from the market and that the Benlate currently available was safe to purchase (Plaintiffs' Exhibit 120);
(4) a letter dated April 3, 1991, from Leon J. De Leon to Jaime Gurdian of Abonos Superior, DuPont's distributor, stating that the Benlate 50 DF shipped to Costa Rica was not contaminated (Plaintiffs' Exhibit 90);
(5) a letter dated November 6, 1992, from Thomas C. Humphrey to DuPont customers stating that based on scientific *572 testing, DuPont was not able to cause any crop damage from applications of Benlate and that DuPont had decided to no longer pay claims (Plaintiffs' Exhibit 112);
(6) a letter dated September 26, 1991, from Thomas M. Burke, DuPont's outside litigation counsel to Glen Baldwin, DuPont's in-house counsel stating that from a litigation aspect, it was better to leave as unresolved the cause of various growers' damage (Plaintiffs' Exhibit 89);
(7) DuPont's 1-800 Benlate hot-line assurances from as early as July 1991 until early 1992 that DuPont had been unable to detect a problem with Benlate or reproduce damage in plants (Plaintiffs' Exhibits 59 and 60);
(8) a letter dated July 1993 from Morris Bailey, DuPont's Benlate resolution manager, to one of plaintiffs' representatives stating that based upon DuPont's testing and research, Benlate could not have contributed to the reported plant damage and that DuPont did not see any plant damage in its Benlate tests (Plaintiffs' Exhibit 75);
(9) a nationally covered press conference conducted on June 16th, 1993, by a DuPont employee stating that DuPont's 1992 testing did not reveal any scientific evidence indicating that Benlate was defective (Plaintiffs' Exhibit 36, Defendant's Exhibit 53).
As the trial court noted in its order granting a directed verdict, with one exception (predicate act number 8) relating to a communication which occurred after the nurseries had stopped using Benlate, the jury heard no evidence that the nurseries saw or knew about any of these acts, all but one of which were directed to other persons.[2] The trial court, therefore, correctly found that the nurseries did not submit "any evidence that they relied on any particular predicate act."[3]
*573 In light of our holding in O'Malley that RICO plaintiffs must prove direct injury, not just any injury that may be traced to a predicate act, we reject the nurseries' arguments that they might still recover under a number of alternative (target/third party, fraud-on-the-regulator, and body of public information) theories that allegedly relax the reliance requirement. See Byrne v. Nezhat, 261 F.3d 1075, 1110, 1111 (11th Cir.2001)("[a RICO] plaintiff lacks standing to assert, as the basis for mail fraud, misrepresentations directed toward another person or entity.... `When the alleged predicate act is mail ... fraud, the plaintiff must have been a target of the scheme to defraud and must have relied to his detriment on misrepresentations made in furtherance of that scheme'")(quoting Pelletier, 921 F.2d at 1499-1500) (emphasis added); Johnson Enters. v. FPL Group, Inc., 162 F.3d 1290, 1318 (11th Cir.1998)(contractor suffered no direct injuries as a consequence of misrepresentations made to a franchising authority which approved franchise applications); Bivens Gardens Office Bldg., Inc., v. Barnett Banks of Fla., Inc., 140 F.3d 898, 906, 908 (11th Cir.1998)("a party whose injuries result `merely from the misfortunes visited upon a third person by the defendant's acts' lacks standing to pursue a claim under RICO.... [T]he test for RICO standing is whether the alleged injury was directly caused by the RICO violation, not whether such harm was reasonably foreseeable")(quoting Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)); Allocco v. City of Coral Gables, 221 F.Supp.2d 1317, 1363 (S.D.Fla.2002)("a plaintiff cannot base a RICO claim for fraud on misrepresentations made to third parties")(applying Florida RICO); Special Purpose Accounts Receivable Co-op. Corp. v. Prime One Capital Co., L.L.C., 202 F.Supp.2d 1339, 1349 (S.D.Fla.2002)(a plaintiff cannot base a RICO claim for fraud on misrepresentations made to third parties because the injury is not "direct"); see also Sandwich Chef of Texas, Inc. v. Reliance Nat. Indem. Ins. Co., 319 F.3d 205, 223-24 (5th Cir.2003)(refusing to accept "fraud on the regulator" as a "direct and contemporaneous RICO injury," confirming that the "target" theory recognized by the Fourth Circuit in Summit Properties Inc. v. Hoechst Celanese Corp., 214 F.3d 556 (5th Cir.2000) and by the Fifth Circuit in Procter & Gamble Co. v. Amway Corp., 242 F.3d 539 (5th Cir.2001), creates only a "narrow exception to the requirement that the plaintiff prove direct reliance on the defendant's fraudulent predicate act"); Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1369 n. 39 (11th Cir.1997)(reliance cannot be presumed due to a defendant's subjection of "the whole market" to deceptive advertising); Appletree Square I, Ltd. P'ship v. W.R. Grace & Co., 29 F.3d 1283, 1287 (8th Cir.1994)(confirming that courts "have generally limited the use of the fraud-on-the-market theory to securities fraud cases" because the presumptions underlying the theory usually are not present in less well developed markets).
In sum, whether denominated as a lack of standing, a lack of reliance, or a lack of proximate causation, the necessary predicate proof of reliance was missing in this case. A verdict on the nurseries' RICO claim was, therefore, properly directed.[4]

*574 B.

The RICO "Person" And The Distinct RICO "Enterprise"
A verdict was also correctly directed on the nurseries' RICO claims because the nurseries failed to prove the existence of an "enterprise" separate and distinct from the "person" sued for RICO violations. The nurseries sought to recover under section 772.103(3) of the Florida Statutes which makes it "unlawful for any person ... [e]mployed by, or associated with, any enterprise to conduct or participate ... in such enterprise through a pattern of criminal activity...." The words "employed by, or associated with," as used in this provision, anticipates an enterprise separate and distinct from the person charged with a civil RICO violation:
The pertinent section of the statute to be construed states: "It is unlawful for any person employed by or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt." § 895.03(3), Fla. Stat. (1985). The issue before us is whether, within the meaning of section 895.03(3), the defendant can be both the "person" and the "enterprise." Basing our decision on the clear language of section 895.03(3) and on a series of cases which construe that same language in the federal RICO Act, 18 U.S.C.A. § 1962(c) (1984), we find that, given the facts of this case, the defendant cannot be charged with a RICO offense.
... The words "employed by or associated with" logically anticipate the enterprise being a separate entity, different from the person charged.
State v. Nishi, 521 So.2d 252, 253 (Fla. 3d DCA 1988)(emphasis added)[5]; see also United States v. Goldin Indus., Inc., 219 F.3d 1268, 1271 (11th Cir.2000)(en banc)(agreeing with other federal circuit courts that "for the purposes of 18 U.S.C. § 1962(c), the indictment must name a RICO person distinct from the RICO enterprise").
It is well settled that an entity such as DuPont may be a "person" and also part of an "enterprise." See United States v. Goldin Indus., Inc., 219 F.3d 1271, 1277 (holding that three corporations could each be a RICO person and part of a RICO enterprise comprised of a union of the three corporations). Where, however, an entity is both the "person" and the sole *575 entity comprising the "enterprise," the distinctness required does not exist. Id. at 1275 (holding that "the prohibition against the unity of person and enterprise applies only when the singular ... entity is defined as both the person and the only entity comprising the enterprise"); see also Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 164, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001)(distinguishing circumstances where a corporation is alleged to be both the person and part of an enterprise with its agents and employees from circumstances where an employee is named as the person and the corporate employer is named as the enterprise).
In this case, the growers sought to impose liability on DuPont as the person which in association with an enterprise comprised of DuPont, its employees, and its outside counsel (Burke) and his firm (Cabiniss & Burke), engaged in a scheme to defraud by use of the mails and wires.[6] Under these facts, no distinctness exists because the distinctness requirement cannot be circumvented by "alleging a RICO enterprise that consists merely of a corporate defendant [person] associated with its own employees or agents carrying on the regular affairs of the defendant":
Because a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself. Thus, where employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation.
Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339, 344 (2d Cir.1994) (citations omitted)(affirming dismissal of a civil RICO action filed by borrowers against a bank, alleging that the bank via its employees had used extortion and mail fraud to coerce borrowers into restructuring their loans)[7]; see also Discon, *576 Inc. v. NYNEX Corp., 93 F.3d 1055, 1064 (2d Cir.1996), vacated on other grounds, NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998)(confirming that Riverwoods applies to agents, including attorneys and accountants, and that where employees and agents associate to commit a pattern of predicate acts in the course and scope of their employment and on behalf of the corporation, no enterprise distinct from the corporate defendant exists); Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union, 639, 883 F.2d 132, 141 (D.C.Cir.1989)(finding that members of the enterprise "may not simply be subdivisions, agents, or members of the defendant organization.... Where ... the organization is named as defendant, and the organization associates with its member[s] to form the enterprise `association-in-fact,' the requisite distinctness does not obtain"), rev'd in part on other grounds, 913 F.2d 948 (D.C.Cir.1990)(en banc); Old Time Enters., Inc. v. Intl. Coffee Corp., 862 F.2d 1213, 1217 (5th Cir.1989)(observing that "[w]hen the alleged section 1962(c)[RICO] violator is a legal entity, such as a corporation, [the] required separation is not established merely by showing that the corporation, through its employees, officers, and/or directors, committed a pattern of predicate acts in the conduct of its own business. Nor does the fact that individual officers and employees of a corporation, in the course of their employment associate together and commit in the conduct of the corporation's business a pattern of predicate acts in its name and on its behalf, suffice to constitute such officers and employees (alone or together with the corporation itself) an association in fact enterprise distinct from the corporation") (citations omitted); Odishelidze v. Aetna Life & Cas. Co., 853 F.2d 21, 23 (1st Cir.1988)(stating that "it is clear that ... the `person' alleged to be engaged in a racketeering activity (the defendant, that is) must be an entity distinct from the `enterprise,' ... [thus,] the Aetna companies and their officers or employees (the named defendants) cannot be the entity that conducts its own affairs through a pattern of racketeering activity"); Atkinson v. Anadarko Bank and Trust Co., 808 F.2d 438, 441 (5th Cir.1987)("The record here contains no evidence that the bank, its holding company, and the three employees were associated in any manner apart from the activities of the bank. Plaintiffs wholly failed to establish the existence of any entity separate and apart from the bank. In this case, the alleged racketeering activity forming the predicate of the RICO charge was mail fraud  the mailing of false statements requesting payment of interest in excess of the agreed amount. The mailing of loan statements was an activity of the bank. There is no evidence of any other activity on the part of the alleged enterprise"), cert. denied, 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d *577 780 (1987); Goldberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 1998 WL 321446, at *3 n. 5 (S.D.N.Y. June 18, 1998)(observing that lawyers acting for a corporation are agents for RICO purposes); Moffatt Enters., Inc. v. Borden, Inc., 763 F.Supp. 143, 149 (W.D.Pa.1990)(confirming that "an organization cannot join with its own members to do that which it normally does and thereby form an enterprise separate and apart from itself") (quoting Yellow Bus Lines, Inc., 883 F.2d at 141); Newfield v. Shearson Lehman Bros., 699 F.Supp. 1124, 1127 (E.D.Pa.1988)("Since [defendant] Shearson is a corporation, which cannot act but through its agents, plaintiff has in effect pleaded the existence of an association-in-fact of a corporation with its agents, O'Brien and Naft. This will not satisfy the nonidentity requirement"); Hanline v. Sinclair Global Brokerage Corp., 652 F.Supp. 1457, 1462 (W.D.Mo.1987)(observing that "plaintiff's attempt to recover from [defendant] SGBC as a culpable person under RICO cannot be squared with his characterization of defendant SGBC as the enterprise through which the pattern of racketeering activity was conducted." Nor could the plaintiff "define the enterprise as an association between SGBC and three of its employees"); Gilbert v. Prudential-Bache Sec., Inc., 643 F.Supp. 107, 110 (E.D.Pa.1986)(observing that "plaintiff cannot prevail on her claims based upon 18 U.S.C. § 1962(c) because the defendant ... cannot be both the `enterprise' and the person `associated with' the enterprise and conducting its affairs"); Tarasi v. Dravo Corp., 613 F.Supp. 1235, 1236 (W.D.Pa.1985)(observing that "a RICO `person' and a RICO `enterprise' must be distinct entities").[8]
Since no distinction was demonstrated between DuPont as the "person" and DuPont the "enterprise," a verdict was properly directed on the nurseries' civil RICO claims for this reason as well.

C.

Federal Law Preemption
Sub judice, DuPont argued that the majority of the nurseries' claims of mail and wire fraud were barred by FIFRA.[9] The trial court, while acknowledging that in "Florida Benlate cases, ... the Plaintiffs' `failure to warn' type claims *578 are barred by FIFRA," nonetheless rejected DuPont's argument concluding that "FIFRA does not apply extraterritorially" to preempt state claims that allege a failure to warn growers outside of the United States. We do not agree.
Recently, the Fourth District Court of Appeal in E.I. Du Pont De Nemours and Co. v. Aquamar S.A., 881 So.2d 1, 4-5, 2004 WL 625761 (Fla. 4th DCA Mar.31, 2004), confirmed that FIFRA does indeed apply extraterritorially to bar failure to warn claims similar to those asserted here. In Aquamar, an Ecuadorian shrimp farm brought suit in Broward County claiming that it had been injured (in Ecuador) by Benlate contaminated run-off water from nearby banana farms. The shrimp farm prevailed on a negligent distribution theory predicated on DuPont's failure to warn of or resolve run-off problems. On appeal, the shrimp farm claimed that DuPont was negligent in advising and instructing Ecuadorians on application and use of Benlate and pointed to DuPont's actions, or lack thereof, after the company was notified by the Ecuadorian government of shrimp deaths and the suspected link to fungicide. Concluding that FIFRA applied extraterritorially to bar these failure to warn claims, the Aquamar court stated:
In the face of ... [the] comprehensive sale and labeling regulation, Congress included an express preemption clause in FIFRA, prohibiting any "State" from "impos[ing] or continu[ing] in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter." § 136v(b). This language has been interpreted as prohibiting "any state common law cause of action that rests on an alleged failure to warn or convey information about a product through its label." See In re DuPont-Benlate Litig., 859 F.Supp. 619, 622 (D.P.R.1994); ISK Biotech Corp. v. Douberly, 640 So.2d 85, 88 (Fla. 1st DCA 1994)(holding that "FIFRA preempts all state common law actions that are associated in any way with a claim of inadequate labeling"); see also Lowe's Home Ctrs., Inc. v. Olin Corp., 313 F.3d 1307, 1310 (11th Cir.2002).
* * * *
... The ... requirements [of FIFRA] adequately demonstrate Congress's intent to regulate the "labeling" of dangerous pesticides produced in the United States, but exported to foreign markets.
Aquamar argues that the requirements of FIFRA were not intended to bar foreign plaintiffs from asserting claims against United States corporations in state courts for damages caused by the use of pesticides abroad. We agree, of course, that Ecuador is not a "State" and FIFRA's preemption provision could not be read to prohibit the country of Ecuador from imposing additional labeling or warning requirements upon pesticide manufacturers. And, under appropriate jurisdictional circumstances, a foreign plaintiff, relying on foreign law, could probably assert an inadequate warning or "labeling" claim in a state court based on injury arising from the use of a United States-manufactured pesticide abroad. In this case, however, the plaintiff elected to proceed in the State of Florida and under Florida law. Consequently, whether the pesticide at issue was registered for use in the United States and then exported, or simply exported without registration for use in the United States, FIFRA governs the product's label and prohibits the State of Florida from imposing any additional or different requirements.
Id. (second emphasis added).
Thus, to the extent that any claims in the instant action "depend[ed] upon a *579 showing that a pesticide manufacturer's `labeling or packaging' failed to meet a standard `in addition to or different from' FIFRA requirements, section 136v [of FIFRA] preempts those claims."[10]Papas v. Upjohn Co., 985 F.2d 516, 518 (11th Cir.1993).

II.

DuPont's Cross-Appeal
Before the trial began, the nurseries filed motions to strike DuPont's pleadings and for sanctions for what they described as DuPont's destruction of evidence. The nurseries argued that, some five years before this action began, DuPont, facing a mountain of product liability claims, "conducted a test in Costa Rica [at Monte Vista] with Benlate and ornamental plants," duplicating conditions as they existed for these Costa Rican nurseries, and when the test results proved disastrous, the plants and test results were destroyed.
As a threshold matter, the trial court found a duty to preserve any such evidence.[11] Finding that DuPont committed no fraud on the court, that there was no pattern of discovery violations, and that the events at Monte Vista constituted at most non-essential secondary evidence, the trial court refused to strike DuPont's pleadings.[12] The court decided instead to *580 give an adverse inference instruction advising the jury that DuPont had performed Benlate testing in Monte Vista, Costa Rica; that DuPont had an obligation to preserve the evidence from that testing, but had nonetheless destroyed the results; and that from these facts, the jury could infer that the test results were unfavorable to DuPont. DuPont maintains that this instruction improperly determined disputed facts for the jury and invaded the province of the jury. We agree.
"The rule is that the court's instructions to the jury must not assume the truth of facts which are controverted, or impose upon either party a duty not shown by the evidence to exist." Bessett v. Hackett, 66 So.2d 694, 701 (Fla.1953). A court instructs a jury on the law to apply to the facts and "interferes with the jury's function when it instructs the jury as to the facts ... especially where there is conflicting evidence and inferences which can be drawn." Jordan ex rel. Shealey v. Masters, 821 So.2d 342, 347 (Fla. 4th DCA 2002). "[A]n instruction upon the facts, or assuming facts as proven ... concerning which there is conflicting evidence, is erroneous." Southern Pine Co. v. Powell, 48 Fla. 154, 37 So. 570, 571 (1904).
The order issued in response to the nurseries' motions for sanctions irrefutably demonstrates that the trial judge weighed the credibility of conflicting testimony, and then made factual determinations:
The testimony presented by the witnesses in this case conflicts. This Court, having read the depositions of all witnesses filed in this case, having heard substantial live testimony, having reviewed numerous exhibits consisting primarily of DuPont documents, and having considered all facts bearing on the credibility of those witnesses, finds that the testimony of Leon Vargas [a Costa Rican agronomist which at least one witness characterized as the "father of ornamentals"] is persuasive, and represents the most accurate account of what occurred at the Monte Vista site in Costa Rica in 1992.
(Emphasis added).
The jury instruction evidencing this ruling informed the jury:
The Court has determined that DuPont performed tests using Benlate DF and Benlate WP on ornamental plants at Monte Vista, Costa Rica.... The Court has also determined that DuPont had an obligation to maintain and not destroy the results of those tests. Finally, the Court has also determined that, notwithstanding this obligation, the defendant destroyed the results of those tests. Because of the defendant's improper destruction of those Benlate test results, the Court instructs you that you may infer that the results of those tests were adverse or unfavorable to DuPont. You may consider this adverse inference, together with all the other evidence in the case, in considering the issues before you.
I emphasize maybe because it's not a requirement that you do so.
(Emphasis added).
These judicial fact determinations invaded the province of the jury and constitute reversible error.[13]See Southern Pine Co., *581 37 So. at 571 (concluding that a jury instruction on the facts constituted error sufficient to warrant reversal); Jordan ex rel. Shealey, 821 So.2d at 347 (reversing in part on an adverse inference jury instruction which "constituted a comment on the evidence by the trial court and approval for the jury to conclude that all of that evidence would be unfavorable").
Additionally, considering the trial court's account of the circumstances surrounding the Monte Vista evidence and its conclusion that "[p]laintiff has not demonstrated an inability to proceed without [the Monte Vista evidence]," no instruction on the missing Monte Vista evidence would have been appropriate, even if made "contingent" on certain factual determinations by the triers of fact. Rather, the option of applying such an inference should have been limited to the arguments of counsel. See Jordan ex rel. Shealey, 821 So.2d at 346. Like the Fourth District, we have been unable to locate any Florida decision approving an instruction for an adverse inference to be drawn from the failure to produce nonessential evidence. Amlan, Inc. v. Detroit Diesel Corp., 651 So.2d 701 (Fla. 4th DCA 1995), the decision on which the trial court relied to support its decision to instruct the jury, did not involve either an adverse inference or a jury instruction but involved a trial court's refusal to submit evidence to the jury regarding a defendant's pre-trial discovery misconduct.
This case is also wholly unlike Public Health Trust of Dade County v. Valcin, 507 So.2d 596 (Fla.1987), which the nurseries claim supports an instruction. Valcin adopted a rebuttable presumption of negligence *582 in a medical malpractice action premised on a showing that missing documents hindered the plaintiff's "ability to establish a prima facie case." Id. at 599. According to Valcin, where evidence necessary to prove a prima facie case is missing due to actions of a party, an essential element of a claim may be presumed, shifting the burden to the opposing party to dis-prove that element. See Jordan ex rel. Shealey, 821 So.2d at 347. In this case, the trial court correctly found that the nurseries' ability to establish a prima facie case was not hindered by the loss of the Monte Vista evidence. Under these circumstances, Valcin is inapplicable.
An inference is not a presumption:
A presumption differs from an inference. An inference is a logical deduction of fact that the trier of fact draws from existence of another fact or group of facts. Whether the inferred fact is found to exist will be decided by the trier of fact. A presumption is stronger; it compels the trier of fact to find the presumed fact if it finds certain basic facts to be present. Even if a court finds that a presumption is not present in a particular situation, an inference of the same fact can be drawn if it is supported logically by the evidence.
Charles W. Ehrhardt, Florida Evidence § 301.1, at 89-90 (2003)(footnotes omitted); see also 2 J. Wigmore, Evidence § 285, at 192 (James H. Chadbourn rev., 1979). Unlike a Valcin presumption, an inference generally will not support a jury instruction:
It is important to note that an adverse inference from the failure to produce evidence is different than the Valcin rebuttable presumption. If the actions of the opposing party cause evidence to be lost that is necessary to prove a prima facie case, the Valcin presumption shifts the burden of proof to ensure that a jury decides the issue of negligence. In essence, the Valcin presumption supplies an essential element of the case  negligence  and shifts to the defendant the burden of proving that he or she was not negligent. The adverse inference merely allows counsel to argue to the jury the inference that the evidence was lost because it was damaging to the opposing party's case. The jury may accept or reject the inference as it sees fit.
6 Florida Practice, Personal Injury & Wrongful Death Actions § 26.6 (2004 ed.)(footnotes omitted); see Bulkmatic Transport Co. v. Taylor, 860 So.2d 436, 449 (Fla. 1st DCA 2003) (Valcin instruction improper where plaintiff's ability to establish prima facie case is not hindered by the absence of evidence); Jordan ex rel. Shealey, 821 So.2d at 347 (concluding that while "[l]awyers are entitled to argue adverse inferences from the evidence as part of their closing arguments," an adverse inference jury instruction is improper where there was no showing that "the missing evidence [was] essential to the opposing party's prima facie case"); see also Martino v. Wal-Mart Stores, Inc., 835 So.2d 1251, 1256 (Fla. 4th DCA 2003) (inferences should be limited to the arguments of counsel and not form the basis of instruction to the jury); Fla. Std. Jury Instr.(Civ.) 2.3 (in addressing the failure to produce a witness, observing in part: "[w]hile it may be permissible in some circumstances to instruct the jury regarding inferences arising from a party's failure to produce a witness ... the committee conceives that such inferences are more properly referred to in counsel's argument. The committee recommends that no charge be given").
The adverse inference instruction should not have been given and was harmful to DuPont's defense. This error likewise *583 mandates that the judgment in the nurseries' favor be reversed.[14]

III.

Conclusion
As to the nurseries' claims of error, the trial court's order setting aside the jury verdict entered pursuant to the Florida RICO Act is affirmed. The necessary element of reliance was never proved; a RICO enterprise distinct from a RICO person was never established; and FIFRA applies extraterritorially to these claims. As to DuPont's claims of error, because the trial court's instruction concerning what occurred at Monte Vista invaded the province of the jury, we reverse the judgment in the nurseries' favor.[15]
Affirmed in part, reversed in part, and remanded with instructions.
NOTES
[1] Because of the similarities between Florida and federal RICO acts, Florida looks to federal authority regarding the interpretation and application of its act. Lugo v. State, 845 So.2d 74, 96 n. 39 (Fla.2003)(since "Florida['s] RICO statute ... is patterned after its federal counterpart ... Florida courts may look to federal RICO decisions as persuasive authority"); Gross v. State, 765 So.2d 39, 42 (Fla.2000) ("[g]iven the similarity of the state and federal [RICO] statutes, Florida courts have looked to the federal courts for guidance in construing RICO provisions"); O'Malley v. St. Thomas University, Inc., 599 So.2d 999, 1000 (Fla. 3d DCA 1992)("Since Florida RICO is patterned after federal RICO, Florida courts have looked to the federal courts for guidance in interpreting and applying the act. Therefore, federal decisions should be accorded great weight"); see RLS Business Ventures, Inc. v. Second Chance Wholesale, Inc., 784 So.2d 1194, 1195 n. 2 (Fla. 2d DCA 2001)(observing "Florida courts have held that cases interpreting the federal RICO statute, title 18, United States Code, are persuasive as to the meaning of Florida's RICO statute, chapter 895, Florida Statutes")
[2] Five of these communications were mailings never sent to, or known of, by the growers. Another was a letter from DuPont's outside counsel to DuPont, which plaintiffs could not claim to have relied on. The seventh was a set of hotline responses, a hotline which plaintiffs never called. The two final communications, only one of which was made to the nurseries, by the nurseries' own time line, came after the nurseries had stopped using Benlate DF.
[3] We reject the notion that the nurseries demonstrated direct reliance on the purportedly fraudulent letter dated April 3, 1991 (predicate act number 4), from DuPont's area manager Leon J. De Leon to Jaime Gurdian, assistant general manager and purchasing manager of Abonos, the company that distributed Benlate DF in Costa Rica. According to De Leon's uncontroverted testimony, the letter was sent to Gurdian in response to a specific question about possible contamination with atrazine. As De Leon explained, "they wanted to know the possibility that these lots [of Benlate held in Costa Rica] were affected." The letter in response to this inquiry, stated:

[i]f your concern is in reference to the possible contamination reported in the United States, let me assure your [sic] that the product received by you is not in that category.
The possible contamination reported is minimal and measures are currently being taken in the domestic market to comply with local regulations related to these cases.
The nurseries do not argue that the representations made in this response were actually untrue or communicated to them. They claim instead that the letter failed to warn that Benlate was phytotoxic resulting in Abonos' continued recommendation and sale of the product and ultimately in the nurseries' injury. However, Gurdian's testimony reflects only his receipt of this letter; there is no testimony that he relied on it or communicated its content to anyone. This cannot be deemed "clear and convincing evidence" of "injury by reason of violation of the provisions of s. 772.103" as mandated by section 772.104. § 772.104, Fla. Stat. (2003). Moreover, this failure to warn, predicate act appears to be pre-empted by federal law. See section C supra.
[4] DuPont did not waive the right to seek a directed verdict for the nurseries' failure to prove reliance (an essential element of their claim) because it agreed to a jury instruction that stated "to find that injury to the plaintiffs' business or property was caused by reason of the violation of the act, you must find that the injury was caused by, and was a direct result of a violation of Section 772.013(3)[sic]." As stated above, when the alleged predicate act is fraudulent misrepresentation, the plaintiff can prove direct causation only by proving detrimental reliance. Sandwich Chef of Texas, Inc., 319 F.3d at 218 (observing that "[f]or a misrepresentation to cause an injury, there must be reliance")(emphasis added); see First Interstate Dev. Corp. v. Ablanedo, 511 So.2d 536, 539 (Fla.1987)(stating that "to prove fraud, a plaintiff must establish that the defendant made a deliberate and knowing misrepresentation designed to cause, and actually causing detrimental reliance by the plaintiff")(emphasis added); Humana, Inc. v. Castillo, 728 So.2d 261, 265 (Fla. 2d DCA 1999)(observing that "[i]f a plaintiff claims to be misled, but cannot demonstrate a causal connection between the defendant's conduct and the plaintiff's misapprehension, the plaintiff cannot recover")(emphasis added); La Pesca Grande Charters, Inc. v. Moran, 704 So.2d 710, 713 (Fla. 5th DCA 1998)(observing that fraud "is a knowing false statement of fact made with the intent that it cause action in reliance and it does cause such action to the detriment of the victim of the knowing false statement")(emphasis added). Thus, the charge requiring a finding of causation was contingent on proof of reliance and was in no way a waiver of the necessity for proof of that element.
[5] Section 895.03(3) is the counterpart to section 772.103(3), which provides for civil remedies for criminal practices. Both of these provisions are patterned after, and are virtually identical to, 18 U.S.C. § 1962(c).
[6] The nurseries claim on appeal that the enterprise consisted of DuPont; nine of its officers, directors, and employees; its attorney, Burke and his firm; Crawford & Company, DuPont's claims investigation agency; Abonos Superior, DuPont's Costa Rican "agent"; and Terra, a company that formulated or mixed Benlate for DuPont. The nurseries' complaint and RICO Case Statement name only DuPont, its officers, directors and employees, and Burke and his firm as the enterprise.
[7] A number of post King cases (King being issued June 11, 2001) support the continued viability of the distinction outlined in Riverwoods. See Lockheed Martin Corp. v. Boeing Co., 2004 WL 869369, at *14, 314 F.Supp.2d 1198, 1215 (M.D.Fla. Apr.23, 2004)(observing "[a]nalysis of the facts and reasoning in [United States v. Goldin, 219 F.3d 1271 (11th Cir.2000)] Goldin II, Securitron [Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256 (2d Cir.1995)], Discon, Riverwoods, and Cedric Kushner confirms the common-sense conclusion that Boeing is not a proper defendant `person' in this case because Boeing is not sufficiently distinct from the BTSTE [Boeing Trade Secrets Theft Enterprise]"); Stolow v. Greg Manning Auctions Inc., 258 F.Supp.2d 236, 247 (S.D.N.Y.2003)(finding plaintiff had sufficiently alleged that the bid-rigging enterprise was distinct from each defendant, where "[u]nlike enterprises that only consist of a corporation and its employees" the alleged enterprise consisted of unrelated individual defendants and corporations); Int'l Telecom, Inc. v. Generadora Electrica del Oriente S.A., 2002 WL 465291, at *8 (S.D.N.Y. Mar.27, 2002)(observing "[a] plaintiff may not circumvent ... distinctness requirement[s] by alleging a RICO enterprise that `consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant'")(quoting Riverwoods Chappaqua Corp., 30 F.3d at 344); Miller v. Norfolk Southern Ry. Co., 183 F.Supp.2d 996, 1002 (N.D.Ohio 2002)(concluding that plaintiff failed to state the existence of an enterprise within the meaning of RICO based on allegedly false statements made by defendant Norfolk Southern through its employees to Union members); Manhattan Telecomm. Corp., Inc. v. DialAmerica Mktg., Inc., 156 F.Supp.2d 376, 381 (S.D.N.Y.2001)("A plaintiff may not circumvent this `distinctness' requirement `by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant ....'")(quoting Riverwoods Chappaqua Corp., 30 F.3d at 344); Lee v. Gen. Nutrition Cos., Inc., 2001 WL 34032651, at *14 (C.D.Cal. Nov.26, 2001)(observing "[p]laintiffs identify an association-in-fact enterprise consisting of a corporate defendant, its affiliates, and two of its officers.... [T]he Court finds that each of the persons pled operated within a unified corporate structure and were guided by a single corporate consciousness. Consequently, Plaintiffs have failed to allege an enterprise distinct from any of the persons pled and as such, have failed to state a claim under Section 1962(c)").
[8] While the trial court correctly recognized that a "person" for RICO purposes may also be one of a number of members of an "enterprise," it misconstrued Jacobson v. Cooper, 882 F.2d 717, 720 (2d Cir.1989), to mean that DuPont could be both the "person" and part of an "enterprise" along with its agents and employees. In Jacobson, a businessman's RICO complaint alleged that two associates (the persons) had engaged in a scheme using the corporation (the enterprise consisting of the associates and the corporation) to appropriate his real estate business, with the supposed purpose and effect of depriving the businessman of his interests. These facts present no distinctness problem. King, 533 U.S. at 164, 121 S.Ct. 2087 (recognizing that a corporate employee may use a corporation as a vehicle for racketeering). Sub judice, the alleged person was DuPont, not its employees, and the alleged enterprise consisted of DuPont and its employees and agents carrying on DuPont's affairs. Jacobson is inapposite.
[9] The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") provides a comprehensive scheme for pesticide labeling generally making it unlawful for American manufacturers to sell an unregistered pesticide within the United States. 7 U.S.C.A. §§ 136-136y (1999). "[A] manufacturer in the United States may sell or distribute an unregistered pesticide to a foreign country provided it complies with specified labeling requirements and provides a statement to the foreign country indicating that the product is not registered for use in the United States. 7 U.S.C.A. § 136o(a); 40 C.F.R. § 168.65." Aquamar S.A., 881 So.2d 1, 4.
[10] It will be for the trial court on remand to determine what claims, if any, (and of course, other than the precluded RICO claims), the nurseries may maintain. See, e.g., Schuver v. E.I. DuPont de Nemours & Co., 546 N.W.2d 610, 614-16 (Iowa 1996)(holding that FIFRA preempted strict liability and negligent marketing, testing, notification and sale claims that were merely another way of arguing that the product's labels should have warned against use in a certain locale); Mortellite v. Novartis Crop Protection, Inc., 278 F.Supp.2d 390, 397-98 (D.N.J.2003)("`It is immaterial whether an inadequate labeling or failure to warn claim is brought under a negligence or products liability theory.' National Bank of Commerce v. Dow Chemical Co., 165 F.3d 602, 608 (8th Cir.1999). `When a claim, however couched, boils down to an assertion that a pesticide's label failed to warn of the damage plaintiff allegedly suffered, the claim is preempted by FIFRA.' Etcheverry v. Tri-Ag Serv., Inc., 22 Cal.4th 316, 93 Cal.Rptr.2d 36, 993 P.2d 366, 377 (2000).")
[11] The trial court concluded that DuPont had a duty to preserve the Monte Vista evidence based on its knowledge of the flurry of litigation surrounding Benlate DF. DuPont argues that "[p]hotographs, videotape and testimony from direct observation were preserved and available" and that it was under "no duty ... to preserve dead or diseased plants." We will assume for the sake of the instant discussion that considering the facts before it, the trial court correctly determined a duty was owed. See Silhan v. Allstate Ins. Co., 236 F.Supp.2d 1303, 1311-12 (N.D.Fla.2002)(noting a duty to preserve evidence after a lawsuit has been filed and observing that several Fourth District Court of Appeal cases may be read as expanding that duty to earlier stages); see also Telectron, Inc. v. Overhead Door Corp., 116 F.R.D. 107, 127 (S.D.Fla.1987)(imposing sanctions against a litigant on notice that documents and information in its possession are relevant to litigation, who destroys such documents and information); GNLV Corp. v. Service Control Corp., 111 Nev. 866, 900 P.2d 323, 325 (1995)("[E]ven where an action has not been commenced and there is only a potential for litigation, the litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action")(quoting Fire Ins. Exchange v. Zenith Radio Corp., 103 Nev. 648, 747 P.2d 911, 914 (1987)); Pennsylvania Lumberman's Mut. Ins. Co. v. Florida Power & Light Co., 724 So.2d 629, 630 (Fla. 3d DCA 1998) (suggesting that in the context of an action for spoilation of evidence, notification of potential litigation triggers the obligation to preserve evidence).
[12] The court noted that while the nurseries would never be able to examine the Monte Vista evidence, "[p]laintiff has not demonstrated an inability to proceed without it" and that "DuPont did not destroy the actual Benlate Plaintiff used, the formula for Benlate 50 DF, or any such similar piece of critical evidence. Plaintiff has shown at best that DuPont destroyed one of many pieces of evidence relevant to the Benlate crisis. Simply stated, there is no single piece of essential physical evidence in this case."
[13] Compare with the following adverse inference instructions (either given or proposed in similar circumstances) and with at least one Florida standard jury instruction:

(1) The Plaintiff claims that the railroad failed to maintain inspection and maintenance records from the train cars involved in the accident. If you find that: (1) the records at issue would be relevant to the claims made by the plaintiff; (2) that the records were destroyed; and (3) by the time the records were destroyed, the railroad knew or reasonably should have known they would be relevant in litigation that was reasonably foreseeable, then you may infer that the contents of these destroyed records would be harmful to the railroad's position in this case. You need not draw this inference; I merely instruct you that you may.
Pace v. Nat'l R. Passenger Corp., 291 F.Supp.2d 93, 97 (D.Conn.2003)(emphasis added).
(2) You have heard testimony about evidence which has not been produced. Counsel for Plaintiffs have argued that this evidence was in Defendant's control and would have proven facts material to the matter in controversy.
If you find the Defendant could have produced the evidence, and that the evidence was within his control, and that this evidence would have been material in deciding among the facts in dispute in this case, then you are permitted, but not required, to infer that the evidence would have been unfavorable to the Defendant.
In deciding whether to draw this inference, you should consider whether the evidence not produced would merely have duplicated another evidence already before you. You may also consider whether the Defendant had a reason for not producing this evidence, which was explained to your satisfaction. Again, any inference you decide to draw should be based on all of the facts and circumstances in this case.
Gilbert v. Cosco Inc., 989 F.2d 399, 405 n. 5 (10th Cir.1993) (emphasis added).
(3) If you find that the circumstances of the occurrence were such that, in the ordinary course of events, it would not have happened in the absence of negligence, *[and that the instrumentality causing an injury was in the exclusive control of the defendant at the time it caused the injury,] or * [that the instrumentality causing an injury was in the exclusive control of the defendant at the time the negligent act or omission, if any, must have occurred and that the instrumentality, after leaving the defendant's control, was not improperly used or handled by others or subjected to harmful forces or conditions,] you may infer that the defendant was negligent unless, taking into consideration all of the evidence in the case, you conclude that the occurrence was not due to any negligence on the part of the defendant.
Florida Standard Jury Instruction (Civil) 4.6 (the res ipsa loquitur instruction)(emphasis added).
[14] In light of this opinion, the trial on remand will differ significantly from that presented below. At bottom, we perceive this case to be a products liability action. Thus, it will be for the trial court to decide what evidentiary rulings are appropriate considering the claims before it, keeping in mind that it would be error to allow any argument or instruction to result in an injustice to either party, or to become a feature of the trial. See Emerson Elec. Co. v. Garcia, 623 So.2d 523, 525 (Fla. 3d DCA 1993). As Beers v. Bayliner Marine Corp., 236 Conn. 769, 675 A.2d 829, 833 (1996), warns:

[T]he destroyed evidence must be relevant to the issue or matter for which the party seeks the inference. For example, the spoliation of a machine may raise an adverse inference with respect to a claim that that particular machine was defective, but such an inference may not be drawn with respect to a claim based upon design defect when the destruction would not hinder the defense. See Donohoe v. American Isuzu Motors, Inc., 157 F.R.D. 238, 244 (M.D.Pa.1994) ("[A]ny other [seat] belt of the same model will possess the same inherent defect and can be tested and examined for defects in the same manner as the [plaintiff's] belt. Defendants will gain no more information as to the existence or non-existence of a design defect from testing the [plaintiff's] belt than they will from testing exemplar belts.").
[15] DuPont maintains that the damages awarded plaintiffs, two modest-sized Costa Rican growers, were erroneous as a matter of law. Although we need not reach this issue, we note that it is virtually impossible to reconcile the record with the damages awarded. We therefore note for re-trial that:

In Florida, "[t]he objective in calculating the proper measure of damages is to place the plaintiff in the same financial position as that occupied before the property was damaged." Ocean Elec. Co. v. Hughes Labs., Inc., 636 So.2d 112, 114 (Fla.Dist.Ct.App.1994). A party whose chattel is harmed "is entitled to the difference between the value before and after the damage." Hillside Van Lines, Inc. v. Matalon, 297 So.2d 848, 848 (Fla.Dist.Ct.App.1974)(per curiam); see also American Equity Ins. Co. v. Van Ginhoven, 788 So.2d 388, 391 (Fla.Dist.Ct.App.2001). Courts, however, must be careful to ensure that the party who incurred the loss is not unjustly enriched by the damages award. Ocean Elec., 636 So.2d at 114.
Nat'l R.R Passenger Corp. (Amtrak) v. Rountree Transp. & Rigging, Inc., 286 F.3d 1233, 1244 (11th Cir.2002).
We also caution that while a business can recover lost prospective profits regardless of whether it is established or has any track record, such profits must be established with a reasonable degree of certainty. See Sostchin v. Doll Enterprises, Inc., 847 So.2d 1123, 1127-28 (Fla. 3d DCA 2003)(to recover for lost profits, a business "must provide competent evidence sufficient to satisfy the mind of a prudent impartial person as to the amount of profits lost"; "[a]ny `yardstick' used to show the amount of profits must be reasonable, and the loss of the profits ... must be reasonably certain").